## STATE OF MISSOURI vs. JACOB HAWTHORN.

1. The act of 26th February, 1835, supplementary to the act of 9th February, 1833, entitled, "An Act to authorize a sum of money to be raised by lottery, to be given to the Sisters of Charity, in the city of St. Louis, for the use of the Hospital over which they now, or may hereafter have the control or management," authorizes the commissioners to sell the lottery; and after a sale, the legislature can pass no law impairing the obligation of the contract of sale.

2. The commissioners having sold the lottery, the act of 19th Dec. 1842, prohibiting the sale of lottery tickets in this State, is unconstitutional as to the vendee—and his right to sell under the purchase made in accordance with the act of 26th February, 1835, is not affected by that act.

ERROR to St. Louis Criminal Court.

STRINGFELLOW, Attorney General for the State.

The State relies on the following points and authorities, to reverse the decision of the criminal court :

1st. It was in the power of the legislature to repeal the act granting to the managers the power to raise money by lottery, so long as that power remained in their hands. See Freliegh vs. the State, 8 Mo. Rep. 606 ; State of Delaware vs. Phalen & Paine, 3 Harrington, R. 452.

2. The amendatory act did not create any contract, or authorize the commissioners to make any contract of a character different in its obligations from that authorized by the act establishing the lottery.

The latter authorized the appointment of a manager, with power to sell tickets, and draw the lottery *in this State*. The former to draw the lottery in any part of the United States. If the manager in the one case could not be deprived of his rights, neither could he in the other.

3d. The defendant, Hawthorn, can only be regarded as the agent of the managers ; they had no right to *sell* the lottery, but only to appoint managers to *draw* the lottery. So long as they had not or could not sell their powers, they could be taken away by the legislature. State of Delaware vs. Phalen and Paine, above referred to ; Statutes of Delaware, 1827, p. 131, entitled, "An act authorizing a lottery," &c.

GEYER, Attorney for Defendant in error.

In support of the judgment of the criminal court, the defendant in error submits the following propositions :

1. The act of the 9th February, 1833, is a contract which could not be impaired by the act of a subsequent legislature. It is a grant to the commissioners, a *quasi corporation*, in trust for the use of the Sisters of Charity. It is not a mere naked power, revocable at pleasure, but it is at least a power coupled with an interest, and as such irrevocable.

2. The act of February, 1835, was the creation of a new power—a power to make contracts, which power being executed, by the making a contract authorized by it—that contract is obligatory upon the State, and the commissioners as well as the other contracting party—and could not be constitutionally altered or impaired.

3. The clause in the contract, which declares that Gregory shall not be bound, after any interference of a competent power to prevent its

The State of Missouri vs. Jacob Hawthorn.

execution, can make no difference. It confers no power on the legislature to annul it—and the question of power must depend on the authority of the legislature, aside of the contract; besides, the exemption depends upon the competency of the interfering power, and not upon the mere exertion of an assumed power, without regard to its constitutionality.

4. The act of assembly under which the defendant was indicted, passed 19th December, 1842, must either be construed not to include lotteries to be drawn under contracts authorized by the State, or if construed to include these, it is unconstitutional and void as to the lottery for the benefit of the St. Louis Hospital—drawn or to be drawn in pursuance of the previous acts of assembly—and the contracts made in conformity thereto. State of Delaware vs. Phalen & Paine, 3 Harrington R. 452.

Napton, J. delivered the opinion of the court.

The defendant Hawthorn, was indicted by the grand jury of St. Louis county, for selling lottery tickets, in the lottery for the benefit of the St. Louis Hospital. Upon a plea of not guilty, and a trial had thereon, the jury found a special verdict, upon which the judgment of the court was for the defendant.

The facts found by the special verdict were as follows : On the 9th February, 1833, the legislature passed an act, entitled, "An act to authorize a sum of money to be raised by lottery, to be given to the Sisters of Charity, in the city of St. Louis, for the use of the Hospital, over which they now, or may hereafter have the control and management."

The first section of this act, appointed certain persons named therein as commissioners, and authorized them by a lottery or lotteries, to raise the sum of ten thousand dollars, to be paid to the sisters of Charity, for the use of the Hospital. By the second section, the commissioners were authorized to appoint a manager, to sell the tickets and draw the lottery in any part of this State, provided the scheme or schemes were first approved by the commissioners. The third section required the manager to execute his bond to the county court, with security as the commissioners might require, in the sum of fifteen thousand dollars, conditioned, that he would pay all prizas, payment of which should be demanded, within twelve months after the drawing, and pay over to the commissioners, all sums in his hands, after the payment of prizes, commissions and other necessary expenses. The tickets were required to

be signed by the manager, and countersigned by one of the commissioners.

On the 26th February, 1835, a supplementary act was passed. By this act the third and fourth sections and the proviso to the second section of the former act were repealed, and the commissioners were authorized "to contract with any person to have said lottery drawn in any part of the United States, on such terms as they shall consider most advantageous," and they were allowed "the same privileges as to the sale of tickets in this State as heretofore, until the amount authorized in said act be raised." The commissioners were also required to take bond and security of the person with whom they contracted, conditioned for the payment of the money, and the faithful performance of the contract.

On the 28th December, 1835, an agreement was made between the commissioners on the one part, and Dudley S. Gregory, on the other part, signed and sealed by all the parties thereto. This agreement after reciting the acts of the legislature above referred to, and that the commissioners had agreed to dispose of said right of drawing schemes of a lottery or lotteries, for the purpose of raising the sum of money authorized by the act, proceeds to state, that the commissioners in consideration of two and a half per cent. of the sales of tickets in this State, agreed to sell, dispose, assign, transfer and set over to, and appoint the said Dudley S. Gregory, sole manager and conductor of said lottery, and transfer to him the sole and exclusive right to draw such scheme or schemes, with the privilege as to the sale of tickets, without the payment of any tax, by virtue of the two acts above recited. The commissioners further transfer to said Gregory, the right to decide the fate of the tickets, by the numbers which may be drawn in any designated class of lotteries, authorized by the laws of Virginia, and under the management of said Gregory. The said Gregory agreed to assume the entire management of the lottery, to pay the two and a half per cent. upon the amount of sales made in this State, to pay all expenses, costs and charges, attending the management of said lottery, and sustain all risks and losses, and pay all prizes drawn, after deducting fifteen per cent. The said Dudley was to give bond and security, in the penalty of thirty thousand dollars, for the performance of every duty required by this contract. The said Gregory also reserved to himself the privilege of abandoning the contract, upon giving sixty days notice, and paying the money due up to the time of abandonment, and was not to be bound by this agreement, in the event of such interference by the legislature, judiciary, or other competent power,

so that the lottery business could not be conducted, in which case payment was to be made only up to the time of such interference. The right of assigning his contract to any other person was also stipulated for.

On the 23d August, 1841, Dudley S. Gregory, assigned this contract to Walter Gregory, which transfer was, on the 5th October, 1841, approved by the commissioners. On the same day Walter Gregory gave bond and security for the performance of the contract, as required by the act. On the 12th May, 1842, Walter Gregory appointed the defendant, Hawthorn, his agent for selling tickets in Missouri. The jury found that the ticket sold by said Hawthorn, was a ticket in a class of the lottery authorised by the above recited act of assembly, and that there had not been raised by the sale of tickets the sum of ten thousand dollars.

The court entered a judgment for the defendant on this verdict, and the State brings the case here by writ of error.

On the 19th December, 1842, the legislature passed an act, repealing all laws authorizing the drawing of any lottery, or the sale of any tickets within this State, and imposed heavy penalties upon any one breaking its provisions. The only queston arising in this case is whether this last mentioned act, so far as it affects the present defendant, is contrary to that clause of the constitution of the United States, which prohibits a State from passing any law impairing the obligation of contracts.

Our opinion in relation to the act of February 9th, 1833, was intimated in the case of Freleigh vs. the State, and the opinion is still entertained that laws of this character, do not create any contract. Neither the commissioners appointed under the act, or the Sisters of Charity, for whose benefit the money was to be raised, acquired any interest which subsequent legislation could not take away. That act did not create any contract between the State and the commissioners, or between the State and the *cestuys que trust*, which could not be modified or repealed at the pleasue of the legislature. The money proposed to be raised was a mere gratuity, without consideration, and the commissioners being merely the agents of the legislature, the law imposed no obligation upon a succeeding legislature, to continue their authority, or permit the drawing of the lottery, and the sale of the tickets.

The act of Feb. 26th, 1835, presents a different aspect. By that act, the commissioners were authorized "to *contract* with any person to have said lottery drawn in any part of the United States, *on such terms as*

*they shall consider most advantageous.*" We have no difficulty in saying that a contract made in pursuance of this act, is as much obligatory upon the State as upon the other contracting party, and the legislature could pass no law impairing its obligation.

Two questions then arise—first, was the contract between Gregory and the commissioners authorized by the act; and second, if so, does the act of 1842, impair its obligation.

Had the commissioners under the act of 1835, sold the lottery privilege, for a specified term of years, in consideration of the sum of ten thousand dollars paid upon the execution of the contract, a question might have been raised, whether such a contract would have been within the scope of their authority. Had such a contract been made and warranted by the law, it could scarcely be doubted that the legislature could not have deprived the purchasers of the benefit of their bargain. In such a case the only question would have been, whether it would be a fair interpretation of this law, to allow the commissioners to go into the market and set up their lottery franchise to the best bidder, thereby restricting the action of the legislature for a term of years, limited only by the circumstances, which might affect the value of such property in the estimation of those who dealt in it. The objection however, if tenable at all, certainly does not lie to the contract made with Gregory. The privilege of selling tickets was not granted for an arbitrary period, but was limited by the happening of the event, which the act itself had fixed as the period of its termination. The right to sell the tickets was transferred to Gregory, until that portion of the proceeds of their sale, which belonged to the Hospital, should amount to the sum authorized to be raised by the act. So far therefore as the character of the contract is concerned, it seems to have been framed with a special regard to the provisions of the act.

It has been suggested in the argument on behalf of the State, that the act of 1835, did not design to affect any change in the law of 1833, except to authorize the manager appointed by the commissioners in the first named act, to draw the lottery, and sell the tickets *without* the limits of this State. The privilege of drawing the lottery in other States, upon schemes connected with other lotteries, was, no doubt, intended to be conferred, but it does not therefore follow, that this was the only power that was actually given to the commissioners. So far as the sale of tickets beyond the limits of the State is concerned, that was a matter about which the legislature of this State could take no action, or if they did, their action could give no rights. The language

of the act is exceedingly broad; the commissioners are authorized "to contract for the drawing of the lottery, on such terms as they might consider the most advantageous." What is there in this language to limit the discretion of the commissioners, or to prevent them from selling the priviledge, either for cash in hand, or payable by instalments, or for a certain portion of the profits?

Believing that the contract with Gregory was fully warranted by the letter, as well as spirit of the act, under which it was made, we proceed to inquire whether the subsequent act of 1845, was a violation of that contract.

It has been argued that Gregory, by his contract with the commissioners, became thereby a mere sub-agent of the State, and as such could exercise no powers, or acquire any interests, which were not conferred upon the manager appointed by the commissioners under the act of 1833. If this construction of the contract be warranted, the whole subject remained in the power of the legislature, upon the principles heretofore assumed. But an examination of this contract will, we apprehend, show a material difference between the cases. Under the act of 1833, the manager appointed by the commissioners received a fixed salary, we suppose proportioned to the value of his services; the entire expense, responsibility and risk, if there were any, rested on the commissioners. He was a mere agent of the commissioners, subject to their control, and therefore indirectly the agent of the State. Gregory, on the other hand, agrees to pay a definite per centage upon the sale of tickets, and assumes upon himself the entire expense of managing the lottery, takes upon himself all the risks, and makes himself responsible for the payment of all prizes. Under the act of 1833, the manager took upon himself no risk whatever, and was a mere agent, with or without a compensation. If he received a compensation, as we may assume that he did, that compensation ceased by the will of the legislature, whose agent he was, and from whom he derived his authority; he was in no worse condition than any officer of the State, whose fees may be reduced or entirely taken away, at the pleasure of the legislature. Not so with the contractors under the act of 1835. The privilege of selling tickets within this State, until a certain sum of money is raised, is sold to them. The value of this privilege may depend very much on its duration. The first drawings may be very unprofitable, and yet the per cent. upon the sale of tickets, which belongs to the Hospital, remains the same. Although bound to pay this per cent. only upon the tickets actually sold, the willingness of this contractor to give this rate of profit, may have been owing to calculations upon the sale of all the

tickets authorized to be sold.    Had the commissioners been authorized to raise only five, instead of ten thousand dollars, would the purchasers of such a privilege have been willing to give as large a per cent. upon the sale of tickets in the one case as in the other?    This it is manifest must depend upon the expense necessary to be encountered in conducting such operations, a matter about which there is no evidence, and concerning which we are left to mere conjecture.    The validity of the law cannot depend upon the value of the contract, and though we may infer from the peculiar character of this contract, that the interference of the legislature with it before its completion, would not occasion any pecuniary loss to Gregory or his assignee, that circumstance does not affect the right of the defendant to insist upon his entire contract.

It is observed that Gregory reserved to himself the right of abandoning this contract on sixty days notice, or upon an interference by the legislature or judiciary.    Had the State or the commissioners reserved a similar privilege, the question now presented would not have arisen. This only shows that the commissioners were willing to extend a privilege to the contractor, which they did not think proper to reserve to themselves.    The right of the legislature to rescind the bargain, is not anywhere recognized by either party, but the actual interinterference with its execution on the part of the State is merely recognized as an occurrence which may authorize the vendee to abandon his bargain.    This, however, is left to his option.    He has not thought proper to take this course, but insists upon his right under the contract.

We are aware that it is at all times a delicate task, for a court to question the validity of a legislative enactment.    It is certainly an unpleasant one where the court feels every disposition to sustain the act whose obvious tendency is to suppress an evil and promote public and private morals.    These considerations, however, cannot be permitted to discharge us from the performance of a duty imposed by the constitution, and especially where reason and justice unite with the constitutional prohibition, in teaching that a legislature can no more violate a contract made by themselves, or under their authority than they can rescind or alter, or impair the obligation of one made between private individuals.

Judge McBride concurring, the judgment is affirmed.