LOUISIANA STATE LOTTERY CO. (DA PONTE v.). See Case No. 3,569.

---

## Case No. 8,541.

LOUISIANA STATE LOTTERY CO. et al. v. FITZPATRICK et al.

[3 Woods, 222.] [1]

Circuit Court, D. Louisiana. April Term, 1879.

CONSTITUTIONAL LAW— IMPAIRING OBLIGATION OF CONTRACTS—CHARTER OF PRIVATE CORPORATION —LOTTERY COMPANY — CHARTER ACTED UPON— INJUNCTION TO STAY PROCEEDINGS IN STATE COURT—LOTTERY PENAL LAWS.

1. The act of congress, approved March 3, 1875 [18 Stat. 470], "To determine the jurisdiction of circuit courts of the United States, and for the removal of causes from state courts, and for other purposes," enlarges the jurisdiction of the circuit courts to the full limits authorized by the constitution.

2. A bill in equity which alleged that a state had, by legislative act, chartered a lottery company with the right to exercise its functions for twenty-five years, the lottery company to pay to the state the sum of $40,000 annually, and had passed a subsequent act repealing the charter of the company, and making it a penal offense to carry on the business authorized by the charter, and which charged that said repealing act impaired the obligation of the contract between the state and the lottery company, disclosed a case arising under the constitution of the United States, of which the circuit court had jurisdiction, irrespective of the citizenship of the parties.

3. The settled doctrine in the United States is that the charter of a private corporation is a contract, the obligation of which cannot be impaired without an infraction of the constitution of the United States: that a grant of franchise is in point of principle identical with a grant of other property; whether the consideration be large or small is not essential, for the motives or inducements which caused the legislature to pass the act cannot be examined to impair its validity.

4. Every valuable privilege given by a charter which conduced to make it acceptable and to promote an organization under it, is placed beyond the power of the legislature, unless the power be reserved at the time the charter is granted.

5. Where a charter conferring the right to draw lotteries has taken the form of an absolute contract, the responsibility of its creation rests with the legislature; the courts must treat it as carrying the obligation which its terms import.

6. A mere license to draw lotteries, which is not inseparable from the essential functions of a corporation, and which has not been acted on, and under which no rights have been vested, may be repealed by any succeeding legislature of the state by which it is granted.

7. But where such license has been acted on, and under it rights have been vested, it cannot be withdrawn by the legislature to the prejudice of those rights. The power of the legislature to recall or modify it is to that extent gone.

8. The grant of a privilege to draw a lottery made to an individual, where no rights have become vested, can be revoked.

9. But where a corporation has been called into existence by a state legislature, for a definite object, declared in the act creating it, and has powers and faculties given to it which are in their nature and operation pertinent to its sole object and necessary to its very existence, its rights and franchises cannot be swept away by a repealing act of the legislature of the state which created it.

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

10. An act of the legislature created a corporation to continue twenty-five years, and then to be dissolved, with a grant of the sole and exclusive privilege of drawing lotteries for the said period, and for the object expressed in the charter, to make of the business a source of revenue to the state, with power to collect capital, issue shares, and to be controlled by directors chosen under the charter, and required the corporation to pay quarterly in advance a specific sum of money to the auditor of state. _Held_, that a charter having these provisions could not be repealed by the legislature.

11. Section 720. Rev. St., which declares that "the writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a state," has application only to such proceeding as had been commenced before the jurisdiction of the federal court attached.

12. It is the duty of a federal court to interfere to defend the franchises of a corporation from invasion, though disguised in form and to be effected through state officers clothed with statutory power.

[Cited in dissenting opinion in Chaffraix v. Board of Liquidation, 11 Fed. 647. Cited in M. Schandler Bottling Co. v. Welch, 42 Fed. 564.]

13. As an unconstitutional law has no inherent force either to authorize or protect, and therefore no claim to be obeyed and no power to divest rights, the agents of its administration, of whatever name or character, may be called to answer and are individually responsible.

[Cited in M. Schandler Bottling Co. v. Welch, 42 Fed. 564.]

14. Generally, courts of equity do not deal with matters of crime, misdemeanors or offenses against prohibitory laws, but they will interfere, by injunction, to stay proceedings, whether connected with crime or not, which go to the immediate or tend to the ultimate destruction of property, or to make it less valuable for use or occupation.

[Cited in M. Schandler Bottling Co. v. Welch, 42 Fed. 564; Louisiana v. Lagarde, 60 Fed. 192.]

[Cited in Orights v. Dahmer (Miss.) 13 South. 237, 238.]

15. Where a charter, such as is described in head note 9, is repealed by the legislature, and the exercise of the rights and franchises conferred by the charter is made a penal offense: _Held_, that the officers of the state charged with the enforcement of the penal laws would be enjoined from arresting or otherwise interfering with the officers and agents of the corporation for acts done by them in the exercise of the rights conferred by said charter.

[Disapproved in Orights v. Dahmer, 13 South. 237, 238.]

In equity. Heard upon motion for injunction pendente lite.

The bill was brought by the Louisiana State Lottery Company, a Louisiana corporation, Charles T. Howard, a citizen of Mississippi, and John A. Morris, a citizen of New York, against Allen Jumel [John Fitzpatrick], and twelve other citizens of Louisiana, and against the city of New Orleans. It was filed April 1, 1879. The case made by the bill was substantially as follows: On August 11, 1868, the legislature of Louisiana passed an act entitled, "An act to increase the revenues of the state and to authorize the incorporation and establishment of the Louisiana State Lottery Company, and to repeal certain acts now in force." [Laws 1868, p. 24.] This act was approved, and took effect as act No. 25, on August 23, 1868. The following are the sections which are material to the controversy raised by this suit:

"Section 1. Be it enacted, etc., that whereas many millions of dollars have been withdrawn from and lost to this state by the sale of Havana, Kentucky, Madrid and other lottery tickets, policies, combinations and devices, and fractional parts thereof, it shall hereafter be unlawful to sell, offer or expose for sale, any of them, or any other lottery, policy or combination ticket or tickets, devices or certificates, or fractional parts thereof, except in such manner or by such persons, their heirs, executors and assigns, as shall be hereinafter authorized.

"Section 2. That the following named persons, to wit: Robert Bloomer, Jesse K. Irwin, John Considine, Charles H. Murray, F. F. Wilder, C. T. Howard, Philip N. Luckett be, and they are hereby constituted and declared a corporation for the objects and purposes, and with the powers and privileges hereinafter specified and set forth:

"Articles of Incorporation.

"Article 1. The name and title of this corporation shall be the Louisiana State Lottery Company, and the domicile thereof shall be in the city of New Orleans, in the state of Louisiana.

"Article 2. The objects and purposes of this corporation are: First. The protection of the state against the great losses heretofore incurred by sending large amounts of money to other states and foreign countries for the purchase of lottery tickets and devices, thereby impoverishing our own people. Second. To establish a solvent and reliable home institution for the sale of lottery policies and combination tickets, devices and certificates, fractional parts thereof, at terms and prices in just proportion to the prizes to be drawn, and to insure perfect fairness and justice in the distribution of such prizes. Third. To provide the means to raise a fund for educational and charitable purposes for the citizens of Louisiana.

"Article 3. The capital stock of this corporation shall be one million of dollars, represented by ten thousand shares of one hundred dollars each.

"Article 4, section 1. The company shall have the right to commence operations when one hundred thousand dollars of the stock is subscribed and paid in.

"Section 2. All powers of this corporation shall be vested in a board of directors, to consist of seven persons, each of whom shall own at least ten shares of the capital stock.

"Section 3. The corporation shall have the right to sue and be sued, to plead and be impleaded, and to appear in any court of justice, and to do any other lawful act such as any person or persons might do for their own defense, interest or safety.

"Section 4. The president of the board of

directors shall be the proper person upon whom to serve citations, notices and other legal process wherein this corporation may be interested.

"Article 5, section 1. The corporation shall pay to the state of Louisiana the sum of forty thousand dollars per annum, which sum shall be payable quarterly in advance, from and after the first day of January, 1869, to the state auditor, who shall deposit the same in the treasury of the state, and which sum shall be credited to the educational fund, and said corporation shall be exempt from all other taxes and licenses of any kind whatever, whether from state, parish or municipal authorities.

"Section 2. The corporation shall furnish bonds to the auditor in the sum of fifty thousand dollars, as security for prompt and punctual payment of the sums set forth in the preceding section.

"Section 3. That any person or persons selling, or offering or exposing for sale, after the thirty-first day of December, 1868, any lottery, policy or combination tickets, devices or certificates, or fractional parts thereof, in violation of this act, and of the rights and privileges herein granted to this corporation, shall be liable to said corporation in damages in a sum not exceeding five thousand dollars, nor less than one thousand dollars for each offense, recoverable by suit before any court of competent jurisdiction.

"Section 4. That this corporation shall be and continue for and during the term of twenty-five years from the first day of January, 1869, for which time it shall have the sole and exclusive privilege of establishing and authorizing a lottery, or series of lotteries, and selling and disposing of lottery tickets, policy, combination devices and certificates, and fractional parts thereof."

By virtue of the provisions of this act, the Louisiana State Lottery Company was immediately organized, and has continued up to the time of filing this bill to do and perform what the said act required and authorized. On January 1st, 1869, it paid to the auditor of the state the sum of ten thousand dollars, and a like sum on the first day of every succeeding quarter year, up to and including January 1st, 1879, amounting in all to more than $400,000, and tendered to the auditor of state, on April 1, 1879, the like sum of $10,000. This last named sum the auditor of state refused to receive, but the lottery company was willing to pay the same and all succeeding installments provided for in said act as the same should fall due. The said lottery company also gave bonds, with sureties, as required by said act, which are held by the auditor, for the prompt and punctual payment of the sums required by said act to be paid. The lottery company has collected and maintained a capital greatly exceeding one hundred thousand dollars, has purchased buildings, established agencies, and made large expenditures in its business and paid heavy charges and losses on account of the same, amounting to more than one million of dollars, in the full confidence of the validity of the grant made by said act, and that the same constituted a commutative contract between the lottery company and the state of Louisiana. The said $400,000 paid into the state treasury by the lottery company has been applied year by year under the appropriations of the general assembly to educational and sanitary purposes. At the session of the general assembly which began in January, 1879, an act was passed which was approved March 27, the purpose of which was to repeal the charter of the lottery company and make the business authorized thereby unlawful. Section 1 of this act repealed the act approved August 23, 1868, by which the lottery company was incorporated, and all other laws passed in the interest of the lottery company. Section 2 declared "that the Louisiana State Lottery Company be and the same is hereby abolished and prohibited from drawing any and all lotteries, or selling lottery tickets either in its corporate capacity or through its officers, directors, stockholders, members or agents directly or indirectly." Section 3 declared "that whoever shall sell, barter or exchange, give or otherwise dispose of, or offer to sell, barter, exchange, give or otherwise dispose of, directly or indirectly, personally or through an agent or agents, either for himself or others, or shall draw any lottery or have any connection with or interest in the drawing of any lottery in this state, or shall have in his possession within this state, with intent to sell or offer for sale or with intent to barter or exchange, or give or otherwise dispose of any lottery tickets or shares, or fractional part thereof, or lottery policy or combination, device or any other writing, certificate or token, intended or purporting to entitle the holder or bearer, or any other person, to any prize, or share, or interest in any prize drawn or to be drawn in any lottery, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be condemned for each offense to and shall suffer imprisonment in the parish prison or jail, as the case may be, not exceeding sixty days, or fined not exceeding one hundred dollars, or both, at the discretion of the court; one-half of such fine to go to the informer, and the other half to the city of New Orleans, or the parish in which said offense is committed, as the case may be." Section 4 declared "that every person who shall set up or promote any lottery in this state, or shall assist or be interested therein, or shall aid by printing or writing, or shall in any way be concerned in setting up, promoting, managing or drawing of any lottery, or shall in any house, shop or building owned or occupied by him or under his control, knowingly permit the setting up, managing or drawing any such lottery, or the sale of any lottery tickets or share of a ticket, or any other writing, certificate, bill, token, or other de-

vice, purporting or intended to entitle the holder, bearer, or any other person, to any prize or share of or interest in any prize to be drawn in a lottery, shall be guilty of a misdemeanor, and on conviction shall suffer imprisonment not to exceed sixty days, or a fine not exceeding one hundred dollars, or both, at the discretion of the court, for each offense, one-half of such fine to go to the informer and the other half to the parish or the city of New Orleans, as the case may be, in which such offense is committed."

The charge of the bill was that this repealing act was an impairment of the obligation of the contract between the lottery company and the state of Louisiana, contained in the act of August 11, 1868, and was in violation of the constitution of the United States, and therefore null and void. The bill further alleged as follows: "The several defendants are officers of the state, concerned in the enforcement of the laws of the state, without regard to the supreme law of the land, and, unless restrained by order of the court, they will engage in the arrest of every agent, servant, clerk or tenant of the lottery company, and that the machinery of the penal code will be by them set in motion to enforce the said repealing act of March 27, 1879, and destroy the rights of the lottery company under an act of August 11, 1868." The prayer of the bill was that the charter granted by the act of August 11, 1868, to the lottery company, might be established and declared valid, and operative and binding as a contract between the state of Louisiana and the lottery company; that said repealing act of March 27, 1879, might be declared inoperative to impair the force and effect of said contract and charter, or the franchises, rights and faculties therein conferred; that the penal enactments contained in said repealing act might be declared unconstitutional, invalid and inoperative, and that all of the defendants might be enjoined from ordering or allowing any prosecution, arrest or seizure of the plaintiffs or any of their agents or servants, customers or persons in any manner connected with the lottery company for doing or performing or being concerned in any act or acts of the drawing of lotteries or the sale or purchase of tickets of said lottery company, and from interfering with them by prosecution, or otherwise in the doing of any act or carrying out any purpose authorized by the charter of the lottery company. The case came on for hearing on the motion of the complainants for an injunction pendente lite, according to the prayer of the bill.

John A. Campbell, Thomas J. Semmes, and Joseph P. Hornor, for complainants.

H. N. Ogden, Atty. Gen., and J. C. Egan, Asst. Atty. Gen., of Louisiana, for defendants.

Mr. Semmes argued:

1. Lotteries, unless so declared by positive law, are neither immoral nor unlawful. The mere establishment of a lottery is not a matter of absolute right or wrong. The prohibition of lotteries depends upon the public policy of the state, as enunciated in its laws. The public policy of Louisiana, as thus expressed, was not opposed to lottery schemes until the constitution of 1845. Prior to that time acts had been passed authorizing lotteries for the benefit of an academy, of a lyceum, of a church, and for the opening of canals and repairing of roads. The constitution of 1864 expressly authorized the vending of lottery tickets under certain regulations prescribed by the legislature. The constitution of 1868 was silent on the subject of lotteries, and left the matter to the discretion of the legislature. When the act incorporating the Louisiana State Lottery Company was passed in 1868, there were laws on the statute book authorizing lotteries to be drawn and lottery tickets to be sold. These facts are referred to to show that the act of setting up of a lottery or selling lottery tickets is not a thing of itself immoral or improper—not condemned by law or religion or morals.

2. The creation of a corporation by a state legislature, for any purpose not prohibited by the constitution, is a contract between the state and that corporation. The mere franchise to be a corporation is a contract between the state and the corporation. Dartmouth College v. Woodward, 4 Wheat. [17 U. S.] 518.

3. The contract between the state of Louisiana and the lottery company, as expressed in the act of incorporation, was that the company should have a corporate existence for twenty-five years; that it should have the franchise to set up lotteries and sell lottery tickets, and that it should have the exclusive right to do these things for the period aforesaid.

4. A lottery franchise, granted by the legislature, is a valid contract. Gregory v. Trustees of Shelby College, 2 Metc. (Ky.) 589; State v. Hawthorn, 9 Mo. 389; Davis v. Caldwell, 2 Rob. (La.) 271.

5. Under the act of March 3, 1875, every suit arising under the constitution or laws of the United States, and in which the amount in controversy is over $500, can be brought in the circuit court, irrespective of the citizenship of the parties.

6. A case involving the construction of a law or treaty, or the constitution of the United States, and which construction becomes necessary to the disposition of the case, is a case arising under the constitution or laws of the United States. Cohens v. Virginia, 6 Wheat. [19 U. S.] 264; Mayor v. Cooper, 6 Wall. [73 U. S.] 252; Miller v. New York [Case No. 9,585].

7. The aid of a court of chancery will be given for the purpose of preventing an unlawful act, though it be also a criminal act, if it has a tendency to destroy the property or business of the complainant. State v. Fagan, 22 La. Ann. 547; Louisiana State Lottery Co.

v. City of New Orleans, 24 La. Ann. 86; Springhead Spinning Co. v. Riley, L. R. 6 Eq. 551; Dixon v. Holden, L. R. 7 Eq. 488.

8. A court of equity will enjoin the officers of a state from the execution of an unconstitutional law, where the tendency is to impair the constitutional rights of the complainant. Osborn v. U. S. Bank, 9 Wheat. [22 U. S.] 738; Davis v. Gray, 16 Wall. [83 U. S.] 203; Crane v. McCoy [Case No. 3,354]; Mason v. Rollins [Id. 9,252]; Shimer v. Morris Canal & Banking Co., 27 N. J. Eq. 364; Lutes v. Briggs, 5 Hun, 67; Stage-Horse Cases, 15 Abb. Pr. (N. S.) 51; Brown v. Trustees of Catlettsburg, 11 Bush, 435; Cherokee Nation v. State of Georgia, 5 Pet. [30 U. S.] 77; Williams v. Mayor, etc., of Detroit, 2 Mich. 560.

9. This bill is not an attempt to enjoin proceedings in a state court, and the injunction asked is not prohibited by section 720, Rev. St. Proceedings cannot be stayed until they have been commenced. Fisk v. Union Pac. R. Co. [Case No. 4,830].

Mr. Ogden:

1. The public policy of Louisiana is opposed to gaming, for the Code withholds any action for the recovery of money won upon a bet, except in particular cases where the tendency is directly to promote the material interests of the state.

2. If the act of March 3, 1875, to determine the jurisdiction of circuit courts of the United States, etc., is so construed as to vest the circuit courts with jurisdiction over a suit between citizens of the same state, the act is unconstitutional. Alexander Hamilton, in the Federalist.

3. This suit does not fairly come within the provisions of the act of March 3, 1875. It is not a case arising under the constitution and laws of the United States, but of the state of Louisiana. The constitution and laws of the United States may be drawn in question in the litigation, but it will not be pretended that they will necessarily be drawn in litigation.

4. This suit is essentially an attempt to remove the criminal proceedings in the state courts to this court for adjudication. It is, therefore, not a suit of a civil nature, to which alone the act of 1875 applies.

5. The injunction prayed for is to stay proceedings in a state court, and is prohibited by section 720, Rev. St. Supervisors v. Durant, 9 Wall. [76 U. S.] 415; Campbell's Case [Case No. 2,349.]

6. The injunction asked for is against the state district attorney, who has no other functions except to represent the state in proceedings in her courts, and two recorders, who are committing magistrates of the state.

7. No decision can be found to sustain the claim of the complainants to an injunction to stay criminal proceedings in a state court. The case of Osborn v. U. S. Bank, 9 Wheat.

[22 U. S.] 738, stops very far short of an authority for what is demanded in this bill.

8. The assumption that a police officer can be enjoined in advance from making an arrest. upon warrant, under a general law of the state demanding punishments for crime, strikes down the whole sovereign power of the state.

9. If there be a wrong, the remedy in the case is very simple. The parties arrested have the right to the writ of habeas corpus whenever an arrest is made without warrant of law. There is, therefore, no necessity for the exercise of the extraordinary and unprecedented power invoked by the bill.

10. If the injunction prayed for in this case can be allowed, then it ought to be allowed in every other case where a person who expected to be charged with crime appeared and alleged that he would be injured by arrest in his property and rights, and that the arrest would be in violation of the constitution and laws of the United States.

Mr. Egan, on the same side:

1. The sum of $40,000 required by the charter of the lottery company to be paid by it to the state, is not in consideration of the privileges and franchises conferred by the charter, but is in lieu of all taxes and licenses, whether imposed by state, parish or municipal authorities.

2. If the setting up and drawing of lotteries is a lawful business, then the act of August 11, 1868, which confers the exclusive right upon the lottery company to carry on this business in the state of Louisiana for the period of twenty-five years, is unconstitutional and void. Slaughter-House Cases, 16 Wall. [83 U. S.] 36.

3. If a grant of power is in violation of the fundamental law. it cannot be valid in one part and invalid in another. U. S. v. Reese, 92 U. S. 214.

4. The act of August 11, 1868, confers upon the lottery company a mere license to set up lotteries and sell lottery tickets. and does not amount to a contract. The license could be withdrawn, and it would be no violation of a contract to do so. Burroughs, Tax'n, 148, 149.

5. The inherent right of sovereignty to abate a nuisance cannot be alienated. Coates v. New York, 7 Cow. 585.

6. The general power of the legislature to legislate for the protection of the life, health, safety and morals of the inhabitants of the state, cannot be the subject of an irrevocable grant by it. O'Leary v. County of Cook, 28 Ill. 534; Dingman v. People, 51 Ill. 277; Lowe v. Williams, 94 U. S. 650; Moore v. State, 48 Miss. 147; Metropolitan Board of Excise v. Barrie, 34 N. Y. 663.

7. If arrests are made under the act of March 27, 1879. it can only result in affecting the liberty of the persons arrested. and they have adequate remedy under the laws of the land. No corporation whose rights

are remotely connected with the arrests can, by seeking an injunction, paralyze the criminal laws of the state.

Mr. Campbell, for complainants, in reply:

1. The constitution of the United States and the laws of congress sanctioned by it are the supreme law of the land. Every officer of the state legislature, executive or judicial, is not only bound as a citizen, but as an officer of the state, to observe that constitution and those laws as supreme. The constitution of the United States confides to the government of the United States judicial power to decide all cases at law or in equity arising under the constitution and laws of the United States, and the treaties made or to be made under their authority, and the act of congress of March 3, 1875, determines that the circuit courts of the United States shall have original cognizance of all cases of the description mentioned in that clause of the constitution. The jurisdiction conferred by this act is independent of the condition or state of the party to the suit. It depends entirely upon the subject matter or causes of the suit. The test of jurisdiction is and must be some right or claim arising under the supreme law of the land. The jurisdiction comprehends all cases at law or in equity under the article. The power of the government to have the constitution and laws of the United States and their treaties authoritatively expounded and enforced by the courts of its own nomination and appointment, admits of no controversy or doubt, and the act of March 3, 1875, appoints the circuit courts as the instruments to do this. The power of congress to do this has been determined in numerous cases by the supreme court of the United States. Martin v. Hunter, 1 Wheat. [14 U. S.] 304; Cohens v. Virginia, 6 Wheat. [19 U. S.] 264; Osborn v. U. S. Bank, 9 Wheat. [22 U. S.] 738; Ableman v. Booth, 21 How. [62 U. S.] 506; Mayor v. Cooper, 6 Wall. [73 U. S.] 247.

2. The charter of the Louisiana State Lottery Company is unquestionably a contract. The charter was not granted as a gratuity, but for a valuable consideration, part of which has been paid and the residue is to be paid.

3. Every concession of a franchise confers rights which cannot be resumed without reservation of power to do so in the grant. It does not belong to the legislature to destroy the concession. It is a contract, the obligation of which cannot be impaired. Wales v. Stetson, 2 Mass. 143; Enfield Toll-Bridge Co. v. Connecticut River Co., 7 Conn. 28; Dartmouth College v. Woodward, 4 Wheat. [17 U. S.] 518; Terrett v. Taylor, 9 Cranch [13 U. S.] 43; 2 Kent, Comm. 306; Cooley, Const. Lim. 279.

4. The charter of the lottery company is not a mere revocable license. A license is usually a permission or authority to do some act in respect to the property or business of another person. If the property be in land, the notion of any estate or right in the land is not conveyed by the use of the word "license." The owner may revoke the license. In matters of taxation, the license is usually a receipt for the assessment as paid, and affords evidence that the licensee has performed the demands of the law. In this class of licenses it is held that the licensee cannot complain of any change in the laws on the subject. A licensee is not obliged to use his license, and, generally, any person may obtain one. There is no exclusive right conveyed. Calder v. Kurby, 5 Gray, 597. This corporation is established for a term of years. It is bound to collect capital, which may be divided into assessable shares. There is a continuing payment, to last during the life of the corporation, and an exclusive privilege to run during the same period. All of these legislative acts impose upon the state the obligation of a contract, which a subsequent legislature cannot impair. Bank of Pennsylvania v. Com., 19 Pa. St. 144.

5. Lottery grants are not an exception to this rule. State v. Phalen, 3 Har. (Del.) 441; Gregory v. Trustees of Shelby College, 2 Metc. (Ky.) 589; State v. Sterling, 8 Mo. 697; Freleigh v. State, Id. 606.

6. The supremacy of the constitution of the United States is not to be undermined or subverted by any ingenious form of enactment framed for the purpose.

7. Where officers charged with the administration of the criminal law become agents for those who impair the obligation of contracts, or who deprive men of life, liberty or property before a hearing and without process, there is no reason why they should not be restrained by preventive process from the courts. Osborn v. U. S. Bank, 9 Wheat. [22 U. S.] 738; Davis v. Gray, 16 Wall. [83 U. S.] 203; Board of Liquidation v. McComb, 92 U. S. 531. The cases that have been cited show that the power of the court of chancery is co-extensive with the wrongs which property may suffer, and that when there is a possession supported with title, an invasion of that right, in a manner to produce irreparable mischief, under color of a law or right by a public officer, and there is no adequate mode of hindrance or redress, an injunction will issue. Wood v. City of Brooklyn, 14 Barb. 425; Cherokee Nation v. State of Georgia, 5 Pet. [30 U. S.] 77.

Mr. Ogden filed a supplemental brief, in which he argued:

1. The lottery is gambling on the most extensive scale, and in the most pernicious form, and gambling of every kind has been reprobated by the common judgment of mankind, and must, therefore, be regarded as immoral.

2. The question is whether the action of a legislature, in granting franchises to a body

of men proposing the establishment of an immoral business in a community, ties the hands of all succeeding legislatures. Can a valid contract be made by a legislature for the establishment of an immoral business? Are not the right and power to protect the physical and moral health of the people inalienable rights of government? The authorities show that the courts have almost invariably so considered them. Calder v. Kurby, 5 Gray, 597; Metropolitan Board of Excise v. Barrie, 34 N. Y. 657.

3. That clause of the constitution of the United States which forbids a state to impair the obligation of contracts, has no reference to any such contract as that set up in the bill, but to contracts by which perfect rights, certain definite, fixed private rights of property were vested; contracts as to property, and not involving any question of public policy upon which the police or other great powers of the state could be called into operation. Butler v. Pennsylvania, 10 How. [51 U. S.] 402.

Mr. Campbell filed a brief in reply:

1. The repealing act complained of does not for the first time prohibit lotteries. By the charter of the lottery company and other acts, all other lotteries were prohibited. The repealing act was simply designed to abrogate the charter of the lottery company, and prohibit its business in common with all other lotteries.

2. In those clauses of the constitution on which complainants rely, to wit, "No state * * shall pass any * * law impairing the obligation of contracts;" "Nor shall any state deprive any person of life, liberty or property without due process of law," there is no exception or reservation of cases, the prohibition is universal. The inquiry is, therefore, what cases are included in the terms of the prohibition? To ascertain this we must resort to the decisions of the supreme court of the United States. The following cases touch this question: Fletcher v. Peck, 6 Cranch [10 U. S.] 87; Dartmouth College v. Woodward, 4 Wheat. [17 U. S.] 526; Sturges v. Crowninshield, Id. 122; Planters' Bank v. Sharp, 6 How. [47 U. S.] 301.

3. It is not denied that corporations may be required to conform to such regulations of a police character as the legislature may see fit to impose. There is a distinction between powers conferred upon corporations by contract and such as belong to them as corporations. The latter may be controlled by the legislature, as natural persons may be, but the former cannot be disturbed without compensation. The following are cases which show what character of regulations the legislature may impose on corporations: Winona & St. Peter R. Co. v. Blake, 94 U. S. 180; Chicago, etc., R. Co. v. Iowa, Id. 155. The following cases show the subordination of police laws of a state to the constitutional commands and prohibitions: The Passenger

Cases, 7 How. [48 U. S.] 283; Toledo W. & W. Ry. Co. v. City of Jacksonville, 67 Ill. 37; Thorpe v. Rutland & B. R. Co., 27 Vt. 140; Com. v. Farmers' & M. Bank, 21 Pick. 542.

4. The present constitution of Louisiana has a clause pronouncing contracts for the sale of persons to be null and void, and notes given for slave property before the war were annulled by the state courts. But the supreme court of the United States overruled these decisions, and held that the law having recognized such a right, and the contracts having been made under the laws, they were legal and valid: Osborn v. Nicholson, 13 Wall. [80 U. S.] 661; Wilmington, etc., R. Co. v. King, 91 U. S. 3. A similar decision was made in respect to the clause in the constitution of this state, which prohibited a recovery on contracts the consideration of which was confederate money. Delmas v. Ins. Co., 14 Wall. [81 U. S.] 661; Wilmington, etc., R. Co. v. King. supra.

5. The cases in Missouri, Kentucky and Delaware maintain that there may be a vested interest in the existence and continuance of a lottery grant which the legislature cannot destroy or abridge. The supreme court of Louisiana recognizes the same rule. Davis v. Caldwell. 2 Rob. (La.) 271.

6. When an act of incorporation has been accepted and rights have vested, the inquiry is pertinent, whence does the legislature acquire a power to divest them. The franchises and rights granted by the general assembly are not to be revoked at the pleasure of that body, or by any convention assembled to make a constitution. See remarks of Chief Justice Shaw in Com. v. Farmers' & M. Bank, supra. See, also, remarks of Chief Justice Taney in Ohio Life Ins. & Trust Co. v. Debolt, 16 How. [57 U. S.] 416.

7. The final question is, whether the complainants have made proper parties to the suit. The defendants are those who are immediately implicated in the infliction of injury under the obnoxious law. Has the state armed these defendants with a commission to destroy a contract made by herself, to deprive the complainants of their rights by an arbitrary exertion of power, without process of law, and this in violation of the constitution of the United States? The court is asked to restrain the defendants, and the complainants are told that the mere fact that the state commands is a sufficient answer. The states having waived the exemption which their sovereignty gave to them from control of the judicial power by their delegation to the courts of the United States, of all cases in law or equity arising under the constitution and laws of the United States, with the grant of authority to hear and determine such causes, it follows that to execute their agency all the usual instruments for effectuating the entire adjustment of the controversy accompany the grant. In respect to cases in which the state is immediately interested, it is competent to sue the agents of the state. Osborn

v. U. S. Bank. 9 Wheat. [22 U. S.] 738; Chicago, etc., R. Co. v. Iowa, 94 U. S. 155; Peik v. Chicago, etc., R. Co., 94 U. S. 165; Board of Liquidation v. McComb, 92 U. S. 531.

BILLINGS, District Judge. The complainants have filed their bill in the circuit court of the United States, under the permission conferred in an act of congress, approved March, 3, 1875, which vested those courts with "original cognizance of all suits of a civil nature, at common law or in equity, arising under the constitution and laws of the United States, or treaties made, or which shall be made, under their authority." 18 Stat. 470. The civil jurisdiction of this court was by this statute enlarged to the entire extent of the judicial power delegated to the congress by the terms of the constitution. Prior to this statute the jurisdiction of this court depended, in a great measure, upon the condition or character of the parties, and upon particular laws of the United States; this statute vests a jurisdiction of all cases which may involve the enforcement of the constitution, laws and treaties of the United States in their determination. The jurisdiction thus acquired comprehends suits which the United States or its officers or agents may bring in the discharge of official duty under the constitution, laws or treaties, and such as may be maintained against them because of official acts or obligations. Besides these are embraced the cases between individuals and corporations where the constitution, laws or treaties of the United States shall form the immediate and determining cause of the controversy, and this fact is exhibited to the court in such a form that the court can take cognizance of it. Until the question is so submitted, and is thus made, the judicial power does not attach. Prior to this enactment the powers, which the congress had not bestowed upon the federal courts by legislative provisions, were dormant because that authority had not designated the tribunal which should be authorized to employ them. This interpretation of this clause of the constitution is announced in Martin v. Hunter, 1 Wheat. [14 U. S.] 304; Osborn v. U. S. Bank, 9 Wheat. [22 U. S.] 738; Ableman v. Booth, 21 How. [62 U. S.] 506; Cohens v. Virginia, 6 Wheat. [19 U. S.] 264; Mayor v. Cooper, 6 Wall. [73 U. S.] 247; and U. S. Bank v. Roberts [Case No. 934]. The plaintiff, the Louisiana State Lottery Company, was incorporated in the year 1868 by the general assembly of Louisiana, and was endowed with corporate rights and privileges to be enjoyed for the term of twenty-five years. The bill charges that these were enjoyed without disturbance until the first of April, 1879, under the authority of the act of incorporation. The bill avers that above four hundred thousand dollars have been paid, according to the charter, into the state treasury; that the auditor had refused to accept the payment due on the 1st of April,

and there is an offer to make that payment and all others as they become due. The cause of the refusal is the enactment by the general assembly in March, 1879, of a statute which repeals in terms the charter of incorporation, abolishes the corporation and imposes penalties to affect all who should carry on the business which the company had by its charter been empowered to conduct. The coplaintiffs aver an interest in and a right to some of the privileges of the corporation by assignment. The bill charges that the repealing act impairs the obligation of a contract and divests rights of property without process of law; and that the general assembly has violated the prohibitory clauses of the constitution, and that the officers and agents of the state, who are defendants in the bill, have already commenced to enforce this unconstitutional and injurious statute, so as to threaten irreparable injury. These facts, thus averred, disclose a case arising under the constitution of the United States.

The supreme court of the United States, in respect to the clause of the constitution, embodied in the act of congress determining the jurisdiction of the circuit courts, say: "The power under consideration is given in general terms. No limitation is imposed. The broadest language is used. All cases so arising are embraced. None are excluded. How jurisdiction shall be acquired by the inferior courts, whether it shall be original or appellate, or original in part and appellate in part, and the manner of procedure in its exercise after it has been acquired, are not prescribed. The constitution is silent upon the subject. They are remitted without check or limitation to the wisdom of the legislature (congress)." Mayor v. Cooper, 6 Wall. [73 U. S.] 247. The act of 1875 (18 Stat. 470) grants to the circuit courts "original cognizance" of all such cases. The court say: "A case in law or equity consists of the right of the one party as well as the other, and may be truly said to arise under the constitution or a law of the United States, whenever its correct decision depends upon the right construction of either." * * * "It is the right and duty of the national government to have its constitution and laws interpreted and applied by its own judicial tribunals. In cases arising under them properly brought before it, this court is the final arbiter. The decisions of the courts of the United States, within their sphere of action, are as conclusive as the laws of congress made in pursuance of the constitution. This is essential to the peace of the nation and to the vigor and efficiency of the government. A different principle would lead to the most mischievous consequences." Mayor v. Cooper, supra.

A case arising under the constitution having been presented to the circuit court, the question comes up whether the case be one in which the plaintiffs have a title to an in-

junction. It is not denied that the general assembly did grant the act of incorporation, that a corporation was organized and has existed until the abrogating act of March, 1879, was adopted. It is not denied that the payment of $40,000, quarterly in advance, was made to the auditor, and that a bond with sureties was given to secure that sum as the charter requires; nor that the required capital has been paid in; nor is there any question that the act of the legislature repealing the charter is the only obstacle to the continuance of the corporation; nor that all the departments of the state government have sanctioned its validity. Louisiana State Lottery Co. v. Richoux, 23 La. Ann. 743; Acts 1875, No. 17 (approved April 3) p. 44. It was decided shortly after the constitution of the United States was made that "the rights legally vested in a corporation cannot be controlled or destroyed by any subsequent statute unless a power for that purpose be reserved to the legislature in the act of incorporation." Wales v. Stetson, 2 Mass. 143. The supreme court of the United States and the courts of the states have concurred in this opinion with a degree of unanimity which hardly any other opinion has obtained. The settled doctrine of the United States is that the charter of a private corporation is a contract the obligation of which cannot be impaired without an infraction of the constitution of the United States; that a grant of franchises is, in point of principle, identical with a grant of other property; whether the consideration be large or small is not essential; for the motives or inducements which caused the legislature to pass the act cannot be examined to offset the validity of the act. Of the sufficiency of the consideration, the legislature is the only competent judge. Every valuable privilege given by the charter, and which conduced to make it acceptable, and to promote an organization under it, is placed beyond the power of the legislature, unless the power be reserved at the time when the charter is granted. Dartmouth College v. Woodward, 4 Wheat. [17 U. S.] 518; State Bank of Ohio v. Knoop, 16 How. [57 U. S.] 369; Hawthorne v. Calef, 2 Wall. [69 U. S.] 10; The Binghamton Bridge, 3 Wall. [70 U. S.] 51. The court is asked by the attorney-general of the state to hold that the contract, if such it be, which has been made by the state on the one part, and the incorporators of the complainants' corporation on the other part, was of no binding force, and could be set aside by the legislature of the state on account of its subject matter, to wit, for the reason that the franchise was for the drawing of lotteries. I have examined with great care the view that has been taken both in the federal and the state courts of the United States as to the binding force of contracts made by the legislature upon the subject matter of drawing lotteries. The authorities are overwhelmingly against the position taken by the attorney-general and his associate, and while lotteries are reprobated as having an immoral tendency by the courts, and they have not cast about to strain inferences to uphold grants with reference to them, nevertheless, where the grant of the right to draw lotteries has taken the form of an absolute contract, the courts have treated the responsibility of its creation as resting entirely with the legislature, and have dealt with it as carrying the obligation which its terms import.

I shall first view the grant of plaintiffs as if it were a mere license and independently of the considerations which spring from the fact, that the plaintiffs are a corporation, and afterwards shall show what further inference is to be derived from that fact. I shall first consider the question with reference to the fact that the plaintiffs had a license granted to them by the legislature for the period of twenty-five years to draw lotteries. In this connection, I find two propositions adhered to with well nigh entire uniformity by the courts of the states and of the United States: First, that a mere license to draw lotteries, which is not inseparable from the essential functions of a corporation, and which has not been acted upon, and under which no rights have been vested, may be repealed by any succeeding legislature of the state in which it is granted; and, secondly, that where a license to draw lotteries has been acted upon, and under it, rights have been vested, it cannot be withdrawn by the legislature to the prejudice of these rights, and the power of the legislature to recall or modify it is to that extent gone. In our own state, in the case of Davis v. Caldwell, 2 Rob. (La.) 271, the supreme court say: "The permission to draw a lottery is not per se a contract, and until it has been accepted and rights have been acquired under it, is perfectly within the control of the legislature." In the state of Missouri the question was very fully discussed in the case of State v. Hawthorn, 9 Mo. 389. The defendant Hawthorn had been indicted for selling lottery tickets in a lottery for the benefit of the St. Louis Hospital. In 1833 the legislature of Missouri had authorized a sum of money to be raised by a lottery drawn by commissioners. In 1835 an agreement was made between the commissioners and Gregory, by which the commissioners, after reciting the act of 1833, agreed to dispose of the said right of drawing schemes of lotteries, and for the consideration of two and a half per cent. on the sales of tickets in that state, transferred to the said Gregory the sole and exclusive right to draw such scheme or schemes. On August 23, 1841, Gregory assigned this contract, and his assignee appointed the defendant Hawthorn his agent for selling lottery tickets in Missouri. In December, 1842, the legislature passed an act repealing all laws authorizing the drawing of any lottery, or the sale of any lottery tickets

within the state of Missouri, and imposed heavy penalties upon any one violating its provisions. The only question raised in the case was whether this last mentioned act, so far as it affected the present defendant, was contrary to that clause of the constitution of the United Sates which prohibited a state from passing any law impairing the obligation of contracts. In the lower criminal court the judgment had been in favor of the defendant, and the supreme court of Missouri, in affirming that judgment, say: "We are aware that it is at all times a delicate task for a court to question the validity of legislative enactments; it is certainly an unpleasant one where the court feels every disposition to sustain the act whose obvious tendency is to suppress an evil and promote public and private morals. These considerations, however, cannot be permitted to discharge us from the performance of a duty imposed by the constitution, and especially where reason and justice unite with the constitutional prohibition in teaching that a legislature can no more violate a contract made by themselves, or under their authority, than they can rescind or alter or impair the obligation of one made between private individuals." In Phalen v. Com., 1 Rob. (Va.) 713, a license had been granted, in the year 1829, to draw lotteries for the purpose of deriving a certain amount of money for improving the Fauquier & Alexandria Turnpike Road. The provision originally contained no limit in time and was limited only in amount. In 1834 the legislature of Virginia passed an act declaring it should not be lawful to draw any lottery within the commonwealth after the first of January, 1837, but providing that nothing in the statute should interfere with the contracts already made or with contracts to be thereafter made for the drawing of lotteries, which provision was not to extend beyond the first of January, 1840. The question there was whether the defendants' authority was derived prior to the repealing act, and the court held that it was not. But in considering the question, and with reference to the character of a legislative permission to draw a lottery, the court, at page 724, say: "A franchise may consist in personal privilege or exemption, or in rights or privileges connected with personal or real estate; and in the latter aspect it is a species of incorporeal hereditament. The one under consideration may be properly characterized as a liberty or license to effect a particular purpose by prescribed means; which may or may not, at particular periods of its existence, and by reason of the rights and immunities which have sprung from its exercise, give rise to an implied contract, or obligation for preserving it, and guarding it from injurious modifications, or become an element of private property beyond the reach of the power of government, without due compensation."

In the state of Delaware the legislature had granted a lottery privilege to certain managers, with power to draw lotteries until a certain sum was raised, and a right to sell the grant. The grant had been sold for a valuable consideration and the legislature sought, by a subsequent act, to subject the parties who were vending lottery tickets under the license so assigned to penalties. The superior court of the state of Delaware, in the case of State v. Phalen, 3 Har. 441, held that the act imposing a penalty and attempting to repeal the grant was void. The court, at page 454, say: "Independent of the constitution of the United States, the act (the annulling act), although clearly contrary to right and incapable of being sustained, yet as an act of a sovereign power may be valid, for it is not always that power regards right, and experience teaches that power unlimited often tramples upon and disregards private right. But when we turn to the clause of the constitution of the United States which appears there inserted as a shield and defense against all legislative action by a state impairing the obligation of contracts, we feel authorized to say not only that the legislature had no right, but they had no power to regulate in the manner attempted by the act of 1841 (the repealing act) the existing contract of 1839." And they say: "Hence we are of opinion that the act of the legislature of the state of Delaware of 1841, so far as the same affects the contract of the defendants, made in 1839, purchasing the rights and privileges of drawing a lottery under the act of 1827, is a violation of the latter clause of the tenth section of the first article of the constitution of the United States, and therefore we adjudge and declare the same, in relation to the said contract, void and of no effect." In the state of Kentucky the court of appeals, in the case of Gregory v. Trustees of Shelby College, 2 Metc. 589, held that the power of the legislature to repeal a grant of a lottery privilege to individuals, and thereby withdraw the privilege, where no rights had been acquired under the act by which it was created, nor any liability incurred in consequence of its passage, was clear and unquestionable, but where vested rights had been acquired under the grant, before the passage of the repealing law, such repealing law must be regarded so far as related to those vested rights as unconstitutional and inoperative. The court say, at page 598: "Although the legislature has the power to repeal the grant of a lottery privilege where no rights have accrued under it, and though lotteries have a demoralizing tendency and exercise a very pernicious influence over the ignorant and credulous part of the community, and for this reason are almost universally denounced by the law making power in the different states of the Union, yet if rights have been acquired or liabilities incurred upon the faith of the privilege conferred by the grant, it would be obviously unjust to permit such

rights to be divested by a legislative revocation of the privilege. If, therefore, any vested rights have been acquired under the present grant, before the passage of the repealing law, then to the extent of such rights at least that law must be regarded as unconstitutional and inoperative.'" In the case of Com. v. Simmons, the circuit court in the state of Kentucky, in a decision rendered during the present term, have followed this case of Gregory v. Trustees of Shelby College, supra.

If we turn now to the supreme court of the United States we find that, in the case of Cohens v. Virginia, the whole law of the right to review the decision of a state court of last resort in a criminal cause, by the supreme court of the United States, was determined and turned upon the question whether a grant by congress of a right to draw lotteries in the District of Columbia had any force beyond that district, and prevented the operation of the criminal law of the state of Virginia in a case where the sale of a ticket had been effected in that state. The whole matter was discussed without an intimation anywhere that the rights of the party before the court, who invoked its power to review, were to be in the slightest degree affected by the fact that his whole exemption was under a grant relating to a lottery. In the case of Phalen v. Virginia, 8 How. [49 U. S.] 163, which, in the state court, I have referred to as reported in 1 Robinson, the supreme court, at page 168, while condemning in strong language the immoral effects of lotteries, says: "When the legislature of Virginia passed this most salutary act for the suppression of lotteries, they, with commendable caution, protected all vested rights." Where, therefore, rights had become vested even under a license to individuals to draw lotteries, according to the settled law of the United States, those rights cannot be disturbed by a mere repealing act of the legislature. But it is not alone with reference to lotteries and contracts with reference to lotteries that the immorality of the consideration has been invoked. Very many of the states of the Union which had been engaged in the insurrection, after the reconstruction, upon the ground of the immoral and pernicious character of the consideration of such contracts, by provisions inserted in their constitutions, declared all contracts wherein slaves, or the currency of the so-called Confederate States was the consideration, should be treated as absolutely void. Those cases went to the supreme court of the United States, and that court, looking simply at the declared policy of the state as to the alleged immoral and pernicious consideration at the time the contracts were made, held that the contracts, when made, had the sanction of competent authority, and that the courts must, therefore, enforce them. Osborn v. Nicholson, 13 Wall. [80 U. S.] 654; Boyce v. Sable, 18 Wall. [85 U. S.] 546; Delmas v. Insurance Co., 14 Wall. [81 U. S.] 661; Wilmington, etc., R. Co. v. King, 91 U. S. 3.

Where rights have become vested, I know of no distinction which would allow states to recede from contracts, or avoid contracts which they have made, more than can individuals. States at all times can and should make advances to higher and still higher ground, with the view of protecting public and private morals. But they owe a duty, not only founded in natural justice but happily enforced by the supreme power of the constitution of the United States, in all their advances to recognize and protect rights which have become vested and obligations to which they have lent their own sanction. But the objection against the claim of the learned solicitors for the defendants is even more insuperable, which springs from the fact that the repealing law whose validity their line of argument requires them to sustain, strikes, so to speak, at the functional privileges or faculties of a corporation. It is true, as was intimated by the supreme court in the case of Boyd v. Alabama, 94 U. S. 645, that a grant of a privilege to draw a lottery made to an individual, where no rights had become vested, was capable of revocation. It may also be true, where, as in the case of Moore v. State, 48 Miss. 147, a corporation is created for agricultural and scientific purposes, that its essential powers and faculties, viewed as a franchise, must be tested by these purposes, and that if a license to draw a lottery is given by a legislature to such a corporation, it may be held and treated as a license granted to an individual as to its revocability, though it cannot be true as seems to be held as a sort of condition of the decision in that cause that a state convention possesses any more authority to impair the obligation of contracts than is possessed by a state legislature. Both are alike subject to the constitution of the United States. But where a corporation has been called into existence by the legislature of a state for a definite object, explicitly declared in the act creating it, and has powers and faculties given to it which are in their nature and operation pertinent to its sole object, and indeed necessary to its very existence; to maintain that the privileges of such a corporation, where there had been no judicial inquiry, and indeed where there was no allegation of ground of forfeiture, could be swept away by a repealing act of the legislature of the state that created it, is to assail well nigh every case decided in the courts of the United States, and of the states which compose them in which the sacredness of charters and of the contracts embodied in them have been adjudicated upon.

It must be borne in mind, that when the thirteen united colonies declared their independence, in their justification of that step, which they put into the form of what is called the Declaration of Independence, among other reasons which they assigned for their action

in thus separating themselves from the king of Great Britain was, "that he had taken away their charters." The sacredness of the charters which emanated from the sovereign was intimately associated in the colonial mind with the administration of a government in which rights should be properly respected and the obligation of contracts justly observed. And when the colonies became states, and the states set up their systems of jurisprudence, the idea of the inviolability of the rights of corporations, which were set forth in their charters, whether those charters came from the king or from the legislature, was well nigh immediately and unanimously announced, and has been with equal unanimity adhered to. Chancellor Kent, in his Commentaries (volume 3, p. 458) says: "Another class of incorporeal hereditaments are franchises, being certain privileges conferred by grant from government, and vested in individuals. In England they are very numerous, and are understood to be royal privileges in the hands of a subject. They contain an implied covenant on the part of the government not to invade the rights vested, and on the part of the grantees to execute the conditions and duties prescribed in the grant. The government cannot resume them at pleasure, or do any act to impair the grant without a breach of contract." And, again (volume 2. p. 306), he says: "A private corporation, whether civil or eleemosynary, is a contract between the government and the corporators, and the legislature cannot repeal, impair or alter the rights and privileges conferred by the charter, against the consent, and without the default of the corporation judicially ascertained and declared." I think this statement of the law, with reference to the franchises or privileges of a corporation, presents the universal American law upon that subject.

In the case of Com. v. Farmers' & M. Bank, 21 Pick. 542, Chief Justice Shaw has clearly defined that which is inviolable in the grant of corporate existence and corporate faculties, so far as relates to this case. "It may be conceded," he says, "that an act of incorporation is to be considered to be a contract between the government, on the one side, and those who accept the act and become a corporation and their successors on the other side; and the corporate power granted cannot be revoked or annulled by an after act of legislation. unless a power has been reserved for that purpose, or with the consent of the corporation. But, applying this rule practically, it is necessary to consider how far, and to what subjects. this contract extends. It is clearly a stipulation on the part of the government that the corporation shall be and continue a corporation for an indefinite time, or for a term limited in the act, unless sooner forfeited for some cause recognized by existing laws as a cause of forfeiture: that their constitution. organization and mode of action, as prescribed by the charter. shall not be annulled or changed by the legislature; that

members shall not be added or removed; that modes of election, expulsion or suspension of members shall not be altered; and that whatever belongs to their organic constitution and action, as bodies politic, shall continue and be determined by the terms of the charter. In addition to which the powers specially granted to them are not to be withdrawn or diminished." In Calder v. Kurby, 5 Gray, 597, a permission had been given to an individual to sell spirituous liquors for one year for the sum of one dollar as a license fee. The court held that this was a mere license and therefore revocable by the state. The court, at page 598, say: "The whole argument of the counsel of the plaintiff is founded on a fallacy. A license authorizing a person to retail spirituous and intoxicating liquors does not create any contract between him and the government. It bears no resemblance to an act of incorporation by which, in consideration of a supposed benefit to the public, certain rights and privileges are granted by the legislature to individuals, under which they embark their skill, enterprise and capital." Cooley, in his Constitutional Limitations (page 279), says: "Those charters of incorporation, however, which are granted, not as a part of the machinery of the government, but for the private benefit or purpose of the corporators. are held to be contracts between the legislature and the corporators, based for their consideration on the liabilities and duties which the corporators assume by accepting them, and the grant of a franchise can no more be resumed by the legislature, or its benefits diminished or impaired, without the consent of the grantees, than any other grant of property or valuable thing, unless the right to do so is reserved in the charter itself." Again, at page 577, he says: "The limit to the exercise of the police power in these cases must be this: The regulations must have reference to the comfort, safety or welfare of society; they must not be in conflict with any of the provisions of the charter, and they must not, under the pretense of regulations. take from the corporation any of the essential rights and privileges which the charter confers. In short, they must be police regulations in fact, and not amendments of the charter in curtailment of the corporate franchise." If now we turn to the averments of the bill, we find that the franchise which was granted for twenty-five years has been acquiesced in by every department of the state government for eleven years; that a corporation has been formed whose stock, in shares of one hundred dollars, exceeds one hundred thousand dollars; that upon the faith of this grant, for this period of twenty-five years, the complainants' corporation has already paid into the state treasury $400,000, and has furthermore, expended upwards of one million dollars, and that the co-complainants claim, by assignment, an interest in the grant. Here, then, are rights of an extraordinary magnitude, which are completely vested, and which, ac-

cording to the authorities which announce the settled law, and have been cited above, were beyond the reach of legislative withdrawal, and which remain vested in the corporation, notwithstanding the repealing law.

It remains further for me to consider the rights held by the Louisiana State Lottery Company, viewed as a corporation, and to ascertain how far the rights which are asserted in the bill are a corporate franchise, and as such absolutely irrevocable. The determination of the nature and extent of the stipulations and their operation and effect, must be derived from the language of the act of incorporation. If the concessions in the charter do not convey an interest—a property in the privileges or franchises, but amount to only a license in fact and confer only a revocable authority, then independently of the rights which had become vested—the plaintiffs have not established a ground for a suit. A license at common law was revocable if a certain time was not fixed, or if no interest in the property passed. But in this act of incorporation the corporate faculties and privileges, by express words and necessary implication, are vested for a term of twenty-five years. The quarterly payments are to be paid and secured for all that time. The corporation must collect a capital of not less than $100,000 within a limited period, and might enlarge it so as to amount to $1,000,000. The powers to make rules and regulations are liberal, and the corporation might do whatever individuals might for its convenience and safety. The conditions impose burdens without any reference to the emoluments to be received, and compel the possession and use of capital.

A license for trading purposes is commonly given to any who comply with the conditions and the term of time as limited, and there are no obligations imposed to perform acts under it. So the ordinary statutes respecting lotteries confer an authority not coupled with any estate or interest for the purpose of raising certain sums of money by the sale of tickets, or of the lottery scheme for some favored object of legislative or public patronage. The act of 1868, on the other hand, constitutes a corporation to continue in being for a prescribed term and then to be dissolved and liquidated. There is a grant of sole and exclusive privileges of an unusual character for the whole term and the precise object is expressed to make of the business a source of revenue for the state, and the corporation is required to pay quarterly, in advance, a sum of money to the auditor. The corporation must collect capital and may issue shares of stock, and is controlled by directors to be chosen under the charter. These are qualities and attributes which do not belong to a corporate body holding by a legislative contract. State v. Phalen, 3 Har. [Del.] 441; Gregory v. Trustees of Shelby College, 2 Metc. (Ky.) 589; State v. Sterling, 8 Mo. 697; Calder v. Kurby, 5 Gray, 597;

Freleigh v. State, 8 Mo. 606. A grant having these characteristics cannot be repealed by the legislature. Bank of Pennsylvania v. Com., 19 Pa. St. 144; State Bank of Ohio v. Knoop, 16 How. [57 U. S.] 369. The repealing act of 1879, then, is not operative to take away the privileges and rights of the Louisiana State Company. The American authorities are adverse to the legislature having any such right. Not only do the qualities which are impressed upon the corporation by its charter and the faculties given to it under that charter make that instrument when construed by admitted principles a contract, but a succeeding legislature has in terms expressly declared it to be such. In Act No. 17, approved April 3, 1875, at page 44, the legislature of Louisiana says: "An appropriation to the board of administrators of the Charity Hospital of $100,000 for the support and maintenance of the said institution, payable as follows: From the annual revenues received from the Louisiana State Lottery Company, which are hereby transferred to the Charity Hospital—$40,000—provided that the contract made between the state and the Louisiana State Lottery Company shall not in any manner be affected or impaired by the transfer."

The question of right having been established as well as that of the wrong committed by the enactment, the question remains to be considered whether the existence and enjoyment of these franchises and rights of the plaintiffs can be protected by the use of the writ of injunction. It is urged by the attorney-general that the prohibition of the Revised Statutes (section 720), which is section 5 of the act of 1793 (1 Stat. 334), which prohibits courts of the United States from staying by injunction proceedings in any court of a state, should prevent this court from granting an injunction in this cause. The case of Supervisors v. Durant, 9 Wall. [76 U. S.] 415, is cited. In that case all that was decided was that "it (the question presented in that case) was not a question as to which court first obtained possession of the case." Because, the effort having been in that case to restrain, as a proceeding in a state court, a mandamus to levy a tax to satisfy a judgment obtained in a United States court, it was held that the circuit court having already rendered judgment could not be restrained from collecting it, that the question, therefore, did not turn upon priority of jurisdiction. In Live-Stock Ass'n v. Crescent City Co. [Case No. 8,408], Mr. Justice Bradley, after quoting this section, and giving it as a reason for refusing an injunction so far as related to suits already instituted, granted an injunction against "commencing or prosecuting any other suits than such as were then pending," and against "suing for any fine or penalty imposed," etc. In Fisk v. Union Pac. R. Co. [Id. 4,830] Judge Blatchford holds that the provision that "a writ of injunction shall not be granted to stay proceedings in

any court of the state," has application only to such proceedings in the state court as had been commenced before the federal jurisdiction attached. He gives two reasons for this conclusion: (1) That this restriction must be construed along with the provision of section 14 of the act of 1789 (1 Stat. 83); that "the federal courts shall have power to issue all writs which may be necessary for the exercise of their respective jurisdictions;" and (2) that if the federal courts had not power to restrain parties from thereafter instituting proceedings in a state court, a defendant could in many ways defeat the jurisdiction and action of the federal court after it had obtained full jurisdiction of the person and of the subject matter. I see no answer to this reasoning. This prohibition of the statute does not stand in the way of complainants obtaining this writ if their case entitles them to it. The question becomes the broad one whether according to the established principles of equity jurisdiction, they can lay claim to the writ. A large capital exists for employment and was collected under terms of the contract. Without protection from the strong hand of their antagonists this capital cannot be longer employed and those rights must be abandoned. The purpose of the state is to destroy the corporation and to resume its corporate franchises. The combination, strength and persistent purpose of a police force controlled by the state and city authorities, unless checked by the power of the court, would necessarily be irresistible. If that force be employed in derogation of rights secured by the supreme law of the land, the charge in the bill that the act would be tyrannical and oppressive is established. The supreme court of the United States has said, in a less aggravated case, "Moral obligations never die. If broken by nations or states, though the terms of reproach are not the same with which we are accustomed to describe the faithlessness of individuals, the violation of right is not the less." Dodge v. Woolsey, 18 How. [59 U. S.] 331. It is certain that this case, if occurring between individuals, would authorize the interposition of a court of equity. Where a party, under color of title, proposes to inflict irreparable mischief, and the recovery of damages is inadequate or uncertain, and the protection of the specific right is a surer mode of doing justice, an injunction will issue. Bonaparte v. Camden R. Co. [Case No. 1,617]. This tribunal should interfere to defend the franchise of a corporation from an invasion, though disguised in form and to be effected through state officers clothed with statutory power. Osborn v. U. S. Bank, 9 Wheat. [22 U. S.] 738. A court of equity will protect an exclusive right from those who attempt to participate in the profits. Livingston v. Ogden, 4 Johns. Ch. 48. The legislation of the congress and the jurisprudence of the United States have applied this remedy with great freedom to support and

sustain rights which have been held under statutes. In the adjustment of claims under treaties or laws of the United States, injunctions are allowed to keep the money secure till the title is settled. Clark v. Clark, 17 How. [58 U. S.] 315.

The statutes in respect to patents and copyrights confer equity jurisdiction in accordance with which inventors and authors may secure the fruits of their inventive powers. In some cases injunctions are allowed against the United States; and there are cases in which the United States has obtained injunctions, to defend its own right, from the circuit courts. U. S. v. Duluth [Case No. 15,001]; U. S. v. Louisville & P. Canal Co. [Id. 15,633]; New Orleans v. U. S., 10 Pet. [35 U. S.] 622. The case of Emperor of Austria v. Day, 3 De Gex, F. & J. 217, is an instructive one upon this subject. Kossuth, with a view to continue his war with Austria for the dominion of Hungary, prepared in England an enormous number of notes signed by him in the name of Hungary, which he proposed to introduce for circulation, as money, into that kingdom. There was a motion before the lord chancellor and the lord justices of Great Britain for an injunction. Lord Justice Turner, speaking to the question of jurisdiction, says: "I agree that the jurisdiction of this court, in a case of this nature, rests upon injury to property, actual or prospective, and that this court has no jurisdiction to prevent the commission of acts merely criminal or merely illegal, and which do not affect any rights of property; but I think there are here rights of property quite sufficient to found jurisdiction in this court. I do not agree to the proposition that there is no remedy in this court, if there be no remedy at law; and still less do I agree to the proposition that this court is bound to send a matter of this description to be tried at law. The highest authority upon the jurisdiction of this court, in enumerating the cases to which the jurisdiction of this court extends, mentions cases of this class, where the principles of law by which the ordinary courts are guided, give no right, but, upon the principles of universal justice, the judicial power is necessary to prevent a wrong and the positive law is silent." The principle laid down is that where the law in principle acknowledges that there is a wrong and there is no adequate or specific remedy, an injunction may be obtained.

The cases cited from the Reports of the Supreme Court of the United States are pregnant with significant meaning upon this subject. The state of Ohio enacted that a branch of the Bank of the United States was established and had continued its operations in that state contrary to a law of that state, and that, if it continued to do so, it must pay an annual tax of $50,000. An injunction was allowed by the circuit court of the United States. In that case, as in this, the authority of the court to hear the cause

or to grant the relief was challenged. On appeal, the supreme court answered: "They could perceive no ground on which the proposition can be maintained, that congress is incapable of giving the circuit courts original jurisdiction in any case to which the appellate jurisdiction extends." This is the answer that the supreme court gave to the suggestion that judicial power, in such cases, must first be exercised in the tribunals of the state and not in the courts of the United States. The same court, in the same case, determined the principles of equitable jurisdiction in such cases. The court say: "Injunctions are often awarded for the protection of parties in the enjoyment of a franchise, but the defendants deny that one was ever granted in a case like this; although the precise case may never have occurred, if the same principle applies the same remedy ought to be afforded. The interference of the court in this class of cases has most frequently been to restrain a person from violating an exclusive franchise by participating in it. But if, instead of a continued participation in the privilege, the attempt be to disable the party from using it, is not the reason for the interference of the court rather strengthened than weakened? * * * The same conservative principle which induces the court to interpose its authority for the protection of exclusive privileges, to prevent the commission of waste, even in some cases trespass, and in many cases destruction, will, we think, apply here." Osborn v. U. S. Bank, 9 Wheat. [22 U. S.] 738. The same state of Ohio, at a later period, passed laws to cripple the operations of her own banks and introduced into the state constitution provisions contrary to the conditions and contracts embodied in their charters. The circuit court of the United States in Ohio allowed an injunction upon the officers of the state from enforcing the state enactments; and the supreme court of the United States says "that the jurisdiction of chancery extends to inquire into and enjoin, as the case may require to be done, any proceedings by individuals in whatever character they may profess to act, if the subject of complaint is an imputed violation of a corporate franchise or the denial of a right growing out of it, for which there is not an adequate remedy at law." Dodge v. Woolsey, 18 How. [59 U. S.] 331. One of the objections answered was that it is contrary to sound policy that the collection of the state revenue should be arrested by the instrumentality of a writ of injunction issuing from the circuit court of the United States.

The bill of the plaintiffs in this suit shows the undisguised purpose of the general assembly of the state to denude the corporation not only of franchise, right and privilege, but of corporate existence, and that, too, contrary to the precise and definite language of the act of incorporation. This was attempted to be done by the mere fiat of the general assembly without any regard to the forms or processes of law. The general assembly did not seem to have called to mind that there were constitutional limitations, both state and federal, upon their omnipotence. Besides this they engrafted upon the act, so as to carry out their purpose of destruction and to give effect to the sections which breathe extermination, penal enactments. All of the acts, agencies and instruments for conducting the business which the corporation was formed to conduct under the legislative guarantees and sanctions are made criminal and stigmatized as misdemeanors if maintained or done. The general assembly did not appear to have heard the voice of the constitution of the state under which they were convened, which commanded that no law impairing the obligation of a contract should be passed; nor the more commanding tones of the people of the United States forming the American Union, that no state shall pass such a law, nor deprive any person of life, liberty or property, without due process of law. The supreme court of the United States have said: "There is no more important provision of this constitution than the one which prohibits states from passing laws impairing the obligations of contracts. And it is one of the highest duties of the federal tribunals to take care that the prohibition shall be neither evaded nor frittered away. Complete effect must be given to it in all its spirit." Murray v. Charleston, 96 U. S. 432. The Act No. 44, which repeals the act passed in 1868 for the establishment and organization for a term of twenty-five years of a corporation, for which a price was stipulated and has been paid, and which arbitrarily abolishes the charter and prohibits the business it was established to conduct, in the light of the decisions of the supreme court of the United States and of this state, must be pronounced to be inoperative and without authority; that the corporation is not abolished, nor its rights, privileges and franchises resumed by the state. The relief prayed for in the bill is due the plaintiffs.

The question remains, have the plaintiffs a title to ask a restraining order upon the defendants? The defendants to a bill like the present one cannot have any estate or interest in the subject-matter, to wit, the rights and franchises of the corporation in possession or expectancy which a decree can affect. The purpose of the legislative act complained of is purely destructive. The agencies selected to execute it are those of mere force. They are commanded to crush out the rights and privileges without any honoring of the bounds of property, though the constitutions of both the Union and the state may surround it. The state is not amenable to any suit, and is shielded by the immunity from any process or legal responsibility. But as an unconstitutional law has no inherent force either to authorize or protect, and, therefore, no claim to be obeyed and no authority to

divest rights, the agents of its administration, of whatever name or character, may be called to answer and are individually responsible. The cases of this sort are numerous. Davis v. Gray, 16 Wall. [83 U. S.] 203; Board of Liquidation v. McComb, 92 U. S. 531. The affidavits filed show that the police officers are the selected ministers for this purpose. Notwithstanding the fact that a hearing of this motion was ordered, these agents were afterwards active, and had made arrests prior to the restraining order and the hearing. The officers of the state plainly contemplated the use of this force. The bill charges it, and these affidavits supply the corroborating proofs. The argument on behalf of the state claimed for this force an authority and an exemption beyond what they are entitled to. This immunity or exemption from all responsibility to the court for acts done in divesting rights of property, and in disregard of the obligations of contracts under a violent law of the state, is apparently a fort which the defendants hope successfully to maintain. Writers on equity jurisdiction properly say that the court of chancery does not deal with matters of crime, misdemeanors, offenses against prohibitory laws, nor questions of mere morality. But there is this reservation, that it is only when those matters are not connected with rights of property with respect to which the court has jurisdiction. Circumstances may confer a jurisdiction. Attorney General v. Cleaver, 18 Ves. 211; Macaulay v. Shackell, 1 Bligh (N. S.) 96. In Springhead Spinning Co. v. Riley (L. R.) 6 Eq. 558, the vice chancellor says: "The jurisdiction of this court is to protect property, and it will interfere by injunction to stay any proceedings, whether connected with crime or not, which go to the immediate or tend to the ultimate destruction of property, or to make it less valuable for use or occupation." In the case of Osborn v. U. S. Bank, supra, the prayer of the bill was to restrain Osborn, an officer of the state of Ohio, from executing a law of that state, made for the great oppression and wrong of the complainants, and to the destruction of rights and privileges conferred on them by their charter, and by the constitution of the United States. The supreme court said: "The true inquiry is, whether an injunction can be issued to restrain a person who is a state officer from performing any official act enjoined by statute, and whether a court of equity can decree restitution if the act be performed." Assuming that the act of the legislature of Ohio was unconstitutional, the question was whether the plaintiffs were entitled to relief in a court of equity against the defendant and to the protection of an injunction. The court answered that the legislature of Ohio had passed a law for the avowed purpose of expelling the bank from the state, and had made it the duty of the defendant (the auditor) to execute it as a ministerial officer. The law, if executed, would unquestionably effect its object, and would deprive the bank of its chartered privileges, so far as they were exercised in the state. The application to the court was to interpose its writ of injunction to protect the bank, "not from the casual trespass of an individual who might perform the act threatened, but from the total destruction of its franchise, of its chartered privileges, so far as respects the state of Ohio." The gravamen of the bill was the invasion of the chartered rights of the bank, derived from the laws of the United States, under color of a warrant from the state of Ohio. directed to its officer for the precise purpose of destroying those rights. Would the remedy have been changed if the legislature of Ohio had made it a crime or misdemeanor to establish or maintain the bank, or for one of its officers to perform any function in its behalf whatsoever? The chartered rights and privileges held under the constitution and laws of the United States were, in either case, the objects to be destroyed. In either case the constitution and `laws that established them were to be subverted and frustrated. In both cases there was the right to protection from the same court, because there was no other court fully adequate to afford a remedy.

The case last cited is in all respects analogous to the case before this court. There is no dissimulation nor concealment in respect to the purpose of Act No. 44. The act is framed for the single purpose to revoke the rights and privileges granted to the plaintiffs, and to resume the control over them, although the charter was designed to confer upon the corporation these rights. If that charter contains a contract, as to which there can be no rational doubt, the nullity of that repealing act is made manifest. Whenever any constitution or law of a state comes in conflict with the supreme law of the land, that constitution or law must yield. The case may be briefly stated thus: The constitution has prohibited any state from passing any law impairing the obligation of contracts, and has delegated to the federal judiciary the authority to enforce this prohibition; this authority has, by the congress, so far as relates to cases of property, been assigned to the circuit courts. Is the prohibition to be evaded and the jurisdiction declined because the forbidden law of the state, while subverting rights of property, seeks to give overwhelming effect to such subversion by placing the execution of the law in the hands of the criminal officers? If this be true, so far as relates to preventive justice, it must be equally true of remedial justice in the federal tribunals. It would follow that the prohibitory provision of the constitution could, so far as relates to any real remedy for injury to property, be evaded, and the constitutional check rendered unavailing at will by any state. Can this be so? Is not the principle as stated in Os-

born v. U. S. Bank, supra, by the supreme court, conclusive of this case as of that? The court there said: "The counsel for the appellants are too intelligent, and have too much self-respect to pretend that a void act can afford any protection to officers who execute it," and cannot, not only the principle which the court in that case enunciate, but the very language which they employ, be adopted as equally decisive of this case as of that, when they say: "The circuit court of the United States has jurisdiction of a bill brought by the United States for the purpose of protecting the bank in the exercise of its franchises, which are threatened to be invaded under the unconstitutional laws of a state; and as the state itself cannot, according to the eleventh amendment to the constitution, be made a party defendant to a suit, it may be maintained against the officers and agents of the state who are intrusted with the execution of such laws."

The officers of every state of the United States, whether executive or judicial, owe to the constitution of the United States a fealty, an homage. an obedience, surpassing that which they owe to their constituents of the state. The people of the United States, composed of all the peoples of the separate states, have adopted the constitution, and have ordained that the terms of that instrument and the laws and treaties made pursuant to it, shall have obedience, anything in the constitution or laws of any state to the contrary notwithstanding. Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1; Dodge v. Woolsey, 18 How. [59 U. S.] 331. The supremacy of this constitution, from the very frame of the government, in cases like this before the court, must be maintained by the courts of the United States. The judicial power was organized so that controversies arising under the constitution and laws, which assumed a judicial form, should, in some cases, originally, and in all cases, finally be determined in the courts of the United States, in order that in every state the constitution and laws should be understood and obeyed in the same manner. M'Culloch v. Maryland, 4 Wheat. [17 U. S.] 316; Ableman v. Booth, 21 How. [62 U. S.] 506. The court acquired jurisdiction of this cause on the first day of April, 1879, by the filing of the bill and by a motion made upon notices served on the same day on defendants for the allowance of a restraining order preliminary to an application for an injunction. The court made an order upon that day. The defendants, or some of them, afterwards, on the 5th day of April, obtained warrants of arrest in the name of the state, the precise purpose of which is to destroy the rights and privileges which were granted in the act number twenty-five of 1868, described in the bill, and to anticipate and defeat the effect of any restraining order or writ of injunction.

The power of a court of chancery to restrain persons subject to the jurisdiction of the court, and parties to a cause pending before it from taking proceedings in other courts, whether domestic or foreign, to defeat the ends of such proceedings, is indisputable. The power rests upon the fact that every court has an authority to defend its jurisdiction and to restrain persons subject to this authority from acts calculated to defeat it. An assignee of an insolvent estate may obtain an injunction upon a creditor who shall send to another state and attach property of the insolvent so as to obtain a priority. So a court may restrain a corporation from making a surrender of its charter while it is a defendant, the object being to defeat the suit. Fisk v. Union Pac. R. Co. [Case No. 4,830]; Dehon v. Foster, 4 Allen. 550. Nor is there anything in the fact that a defendant is an officer and supposes he is performing an official duty which would constitute a reason for withholding the exercise of this jurisdiction. The jurisdiction is conservatory, and is employed where a wrong is attempted under color of law, and with an appearance of right, to inflict permanent and incurable mischief. The remedies at law are, in general, adequate to defend persons from violence and lawlessness. The unoffending citizen is entitled to be protected by the state through its punitive laws. But when the state itself errs and its legislature visits, by a law, constantly recurring penalties upon all the officers and agents of a corporation, it gives rise to a question of the rightfulness of the law, viewed in its operation upon franchises—upon property. For, since a corporation is an artificial being, and can only act through its representatives, any law which forbids, under penal sanctions, every conceivable corporate act of officers and agents, must assail the value and existence of its privileges, and if that law be unauthorized, its operation may be restrained and the property, which is by the constitution exempted from its power, may be protected by the proper process of the courts. Wood v. City of Brooklyn, 14 Barb. 425; Frewin v. Lewis, 4 Mylne & C. 249.

The states may define crime, affix penalties, arraign and punish those who commit the prohibited acts. Where there is no right of property involved, the circuit courts have no jurisdiction to deal at all with any criminal process of a state, however void may be the law from which it emanates. Such case can be submitted to the constitutional tests only by being brought from the state court of last resort before the supreme court of the United States. But in a case which, as does this, involves the right of property, in which an invasion of those rights is sought to be effected through processes based upon a law of a state, void, because unconstitutional, it makes no difference whether the void law is found in a criminal or civil code, or whether the process which is sought to be made the instrument of injury bears the seal of a

police magistrate or the signature of a state auditor. Both are void because resting upon a prohibited and void law of a state. Those who issue and use them may be sued at law for damages, and in proper cases of equitable jurisdiction those who threaten to use them may be restrained by injunction. In the case of Cohens v. Virginia, supra, the supreme court held that the restraining power of the constitution could be exerted through that court in civil and criminal causes, and upon states in their efforts to pass civil or criminal laws which were prohibited. In matters as to which jurisdiction is confided to the circuit courts, namely, in civil causes, the jurisdiction is equally comprehensive so far as relates to the character of the state laws, and is necessarily established by the same reasoning. It is true the review by a writ of error to the state court of last resort would defeat the unconstitutional law so far as an authoritative declaration of guilt or innocence was concerned; but would afford neither redress nor protection so far as the plaintiffs' rights of property are concerned. The jurisdiction of the circuit courts in the cases included in the statute commences where the invaded rights of property commences, and only ends where they end. The case is a peculiar one. The circuit courts of the United States have original cognizance of all cases in law or in equity arising under the constitution of the United States. This jurisdiction was granted that rights—civil rights—arising under the constitution should be protected, not only ultimately, but also in the first instance, by the courts of the United States. No suit or suits, which can be brought at law, will secure protection to the plaintiffs. The mischief will be permanent and irreparable unless there be a relief in equity. The party that originates the wrong is exempt from the jurisdiction of the court. Unless jurisdiction in equity be obtained, then the supreme law is defeated and its provisions frustrated. The constitution has already enjoined the state from committing the wrong by impairing the obligation of its contract. But this injunction is defied, and we are told that because the infliction of the injury is done in the name and by the direction of the state there can be no inhibition nor restraining order. To hold this would be to subordinate the constitution of the United States to the authority of a legislative act, and to disregard the great mandate of that constitution which commands that "the judges in every state shall be bound thereby, anything in the laws of any state to the contrary notwithstanding." The motion for injunction pendente lite, as prayed for, must prevail. Ordered accordingly.