(Superior Court of Cincinnati.—*Special Term.*)

THE PRE-DIGESTED FOOD COMPANY *v.* FREDERICK B. McNEAL, DAIRY AND FOOD COMMISSIONER FOR THE STATE OF OHIO ET AL.

The plaintiff company, which is the manufacturer of an article named *Paskola*, intended to assist weak digestions, began an action against the Ohio Dairy and Food Commissioner and his assistants, alleging in its petition that said Paskola in no way violated the law of the state against the adulteration of foods and drugs; but that defendants, well knowing said fact, nevertheless had maliciously conspired to drive the same out of the state, to the irreparable damage of plaintiff, (1) by prosecuting upon the charge of violating said food laws, those druggists and dealers who sold said article; (2) by threatening to prosecute those who, in the future, should sell the same; (3) by making false and libelous publications as to the nature and ingredients of said article. Demurrer to petition sustained. *Held:*

1. Equity has no jurisdiction upon the ground that complainant is innocent of a charge or charges about to be preferred in the criminal courts by the officers of the state acting under a valid law to enjoin such officers from preferring such charges and prosecuting the same; and the fact that the prosecutions affect property rights, and that the damages occasioned by such prosecutions may be irreparable is immaterial.

2. Equity has no jurisdiction to restrain a publication upon the ground that it will be a libel upon the business of complainant.

3. The principle declared in the class of cases in which equity has restrained the publication of a libel to prevent customers of a firm from being driven off by intimidation and threats, can not be applied to a case of this character where the threats relate to the prosecution, by officers of the state, under the food and drug laws, of persons selling a product which may vary, from time to time, in its ingredients.

(Decided March 30, 1895.)

SMITH, J.

Plaintiff avers that it is an incorporated company created and organized under the laws of New York, and doing business in that state.

"That by an act passed by the General Assembly of the State of Ohio, on the 8th day of May, 1886, and by subsequent amendatory acts passed on the 4th of March, and the first day of May, 1891, on the 29th day of March, 1893, and on the 19th day of April, 1894, there was created the office of Dairy and Food Commissioner for the State of Ohio; and by said original and amendatory acts, it was made the duty of such Dairy and Food Commissioner to attend to the enforcement of all the laws against fraud and adulteration or impurities in foods, drinks, or drugs, and unlawful labelling in the state of Ohio, and for that purpose to appoint two assistant commissioners, and to employ such experts, chemists, agents, inspectors and counsel as he might deem necessary for the proper enforcement of said laws; and by an act passed on the 21st day of March, 1887, it was declared that it should also be the duty of such Dairy and Food Commissioner and his assistants to inspect any articles of food or drink, made or offered for sale in the state of Ohio as an article of food or drink, and to prosecute, or cause to be prosecuted, any person or persons, firm or firms, corporation or corporations engaged in the manufacture or sale of any adulterated article of food or drink, adulterated in violation of any laws of the state of Ohio.

"That the defendant, Frederick B. McNeal, is the duly elected and qualified incumbent of said office of Dairy and Food Commissioner and was such at the several dates hereinafter mentioned, and the defendants, Gustave G. Luebbing and William H. Stewart, are, and at the several dates hereinafter mentioned were, the assistant commissioners, appointed by the said McNeal; and the said Charles T. P. Fennell is, and at the several dates was the chemist employed by said McNeal, as authorized by the Act or Acts aforesaid.

"The plaintiff is, and for a long time has been engaged in the manufacture and sale of a commodity, more fully described below, originated and

manufactured exclusively by the plaintiff, and denominated by plaintiff as Paskola; that said commodity was intended to be, and always has been made and sold as, and is, in fact, an article of food, to be used by persons having weak stomachs, or indigestion, or dyspepsia, and is efficacious in assisting the digestive organs of the human body in properly performing their natural functions, and in supplying the system with a form of maize or starch food previously digested by chemical process, together with certain portions of nitrogenous matter or albuminoids, with the common result of overcoming indigestion, and creating a fleshiness in thin people, and in cases of wasting diseases; that the complete formula of said commodity is a trade secret of great pecuniary value to plaintiff, and is the result of long continued and expensive experiments of eminent men, learned in the science of of chemistry and physiology; but, plaintiff avers, the component parts thereof, by chemical analysis, are dextrose, maltose, dextrine, (chemically known as predigested starch food, and commercially known as glucose), albuminoids, or meaty substance, hydrochloric acid, (which is the natural acid of the gastric juice of the human stomach), and certain vegetable ferments which, acting in combination with the hydrochloric acid under the natural conditions of the human stomach, as to heat and water, performs upon solid foods the same digestive action performed by the functions of the human system; that the proportions of these ingredients are so arranged, that in combination and taken into the body along with the usual and ordinary foods of man, the system is supplied with the requisite starchy substances already digested and ready for assimilation without digestive action, and with sufficient hydrocholoric acid and ferments to assist the weakened or impaired digestive functions of the body to digest and assimilate the meat foods consumed in ordinary daily life."

Plaintiff avers that the ingredient therein, commercially known as glucose, is in nowise injurious or deleterious to health, but is recognized as a "wholesome product for food."

It is further alleged that a large amount of money has been expended by plaintiff in introducing Paskola to the public, and that the sales of the same are made by plaintiff directly to the wholesale and retail druggists of the country, from whom all purchases by the general public are made.

It is further alleged, "that said commodity, Paskola, is in no sense an adulterated food, drug, or medicine, as defined by the laws of Ohio, and in no manner or form violates any laws of said state; but that notwithstanding these facts, the defendants well knowing the same, have unlawfully and maliciously combined and confederated together 'to drive Paskola out of the state of Ohio,' and to prevent the sale thereof in said state, * * * for the reason, as privately claimed by them, either ignorantly or maliciously that the plaintiff is charging too great a price for the commodity, compared with its cost, and is in this manner, defrauding the public."

The petition then proceeds to set forth in detail, and at great length, the acts of the defendants of which the plaintiff complains.

The allegations in regard to them may be summarized as follows:

1. That they induced said Fennell to make, and he did make, certain false and fraudulent analyses of said commodity, and that such analyses are made the bases for criminal prosecutions against the druggists who are engaged in the sale of said commodity.

2. That they caused the false and fraudulent statements to be made in the public press, that the article, Paskola, consisted only of glucose, and that glucose is injurious to health.

3. That they published threats that every druggist in the state who sells said article, is guilty of violating the laws of Ohio, and will be arrested and prosecuted therefor.

4. That on or about the 6th of October, 1894, Luebbing, in his official capacity, with the connivance of McNeal, and acting upon the fraudulent analysis of Fennell, began a prosecution before Phillip Winkler, a justice of the peace in and for Cincinnati township, against one Milton Franken, a drug clerk in the employ of Wilmot J. Hall, a Cincinnati druggist, charging the sale "of an article of food, to-wit: Glucose, which was adulterated in the following respect: It was sold under another name, to-wit: The name of Paskola, contrary to the statute in such cases made and provided, and against the peace and dignity of the state of Ohio;" and that said proceeding was dismissed upon a demurrer of said Franken.

5. That they caused said charges against Franken to be published for the purpose of injuring the sale of Paskola, by terrorizing the druggists in the city of Cincinnati and elsewhere.

6. That immediately after the dismissal of the proceeding against Franken before Phillip Winkler, as aforesaid, another prosecution was begun against Franken before Edward Tyrell, a justice of the peace in and for Cincinnati township, for the same offense as charged before said Winkler, and that upon a trial before said Tyrell and a jury, the jury returned a verdict of not guilty.

7. That during said trial defendants McNeal and Luebbing openly and publicly threatened through the public press, that even if the jury should acquit said Franken, they, the said McNeal and Luebbing, would immediately cause the arrests of druggists all over the state of Ohio, if they should continue to sell Paskola.

8. That on the —— day of December, 1894, said Luebbing began a prosecution before Philip Winkler aforesaid, against one John Oesper, a drug clerk in the employ of one M. C. Dow, a druggist in Cincinnati, charging said Oesper with the sale of "a drug, to-wit, a medicine for internal use, under a name not recognized in the United States Pharmacopœia, nor in any other Pharmacopœia, nor in any other standard work on *Materia Medica*, to-wit, the name of Paskola, which fell below the professed standard under which it was sold, in quality, in that, first, it was represented as containing a sufficient percentage of albumen to take the place of meats, and contained no albumen; and, second, its was represented as a cure for all wasting diseases, and is not a cure for wasting diseases; contrary to the statute in such cases made and provided, and against the peace and dignity of the state of Ohio;" but that greatly to the damage of plaintiff, who had made expensive preparations for the trial of said case, it was twice postponed by said magistrate at the request of said McNeal and Luebbing over the objection of the defendant in the cause.

9. That during the hearing of the charge against Oesper, McNeal, acting through one of his assistants, William H. Stewart, began a prosecution against the members of the firm of Benton, Myers & Co., wholesal druggists in Cleveland, and that one of the defendants was, for some reason unknown to the plaintiffs, induced to plead guilty, and the others were dismissed.

10. That the arrest of a drug clerk at Ironton has been, or is about to be made by Luebbing.

11. That it is impossible for defendants arrested for the sale of said Paskola to make a defense except with the assistance of plaintiff, for the reason that it is necessary to employ the services of men learned in the science of chemistry and physiology, and this involves a large expense which persons arrested are not willing to bear.

12. That defendants knowing the facts just stated, and in order to prevent the plaintiff from assisting in the defense, are threatening to cause the arrests of druggists in various parts of the state, at the same time.

13. That plaintiffs are suffering great and irreparable injury and dam-

age in the loss of patronage of said commodity in the state of Ohio, said loss consisting of profits which are incapable of being estimated and awarded in any action at law, and that if defendants are permitted to continue to cause arrests throughout Ohio of persons selling said commodity, or are permitted to continue their threats to do so, the sale of Paskola will soon be entirely stopped in Ohio, to the great and irreparable damage of the plaintiff.

The petition concludes with the following prayer:

"Wherefore, plaintiff prays that said defendants may be forever enjoined from further committing the unlawful acts, and from further using the powers and color of their offices for the purpose of oppressing plaintiff and destroying its property and business aforesaid; that pending the final hearing of this cause, the defendants may be temporarily restrained from committing said acts; the plaintiff prays for all such other and further relief as may be just and equitable in the premises."

It will be observed that this prayer is somewhat vague, and its interpretation requires a reference back to the allegations of the petition. Referring back to the petition, the injunctions prayed for against the defendants may be classified under four heads.

(1). From prosecuting anyone for selling Paskola.

(2). From prosecuting more cases than the defendant is able to defend.

(3). From publishing false statements as to the ingredients of Paskola.

(4). From threatening the customers of plaintiff that if they sell Paskola they will be arrested and prosecuted for the same.

The contention of the plaintiff is based on two equitable principles, which are claimed to be applicable to this case, (1), that the jurisdiction of a court of equity extends to the protection of property, and, (2), that where the plaintiff shows that unless a court of equity interferes to protect him, he will be irreparably damaged, equity will afford him the needed protection.

A loose notion often prevails both on the bench and at the bar, that equity as administered by the courts, is something above the law, and not the designation of a particular department of the law governed by fixed principles which the courts are no more at liberty to disregard than they are to disregard the principles laid down in the common law courts. The true nature of equity jurisdiction in this respect is stated by Pomeroy's Equity Jurisprudence, section 47, as follows:

"It is very certain that no court of chancery jurisdiction would at the present day consciously and intentionally attempt to correct the rigor of the law, or to supply its defects, by deciding contrary to its settled rules, in any manner, to any extent, or under any circumstances beyond the already settled principles of equity jurisprudence. Those principles and doctrines may unquestionably be extended to new facts and circumstances as they arise, which are analogous to facts and circumstances that have already been the subject-matter of judicial disposition; but this process of growth is also carried on in exactly the same manner, and to the same extent by the courts of law. Nor would a chancellor at the present day assume to decide the facts of a controversy according to his own standard of right and justice, independently of fixed rules; he would not attempt to exercise the *arbitrium boni viri*; on the contrary, he is governed in his judicial functions by doctrines and rules embodied in precedents, and does not in this respect possess any greater liberty than the law judges."

Applying these principles to the case at bar, the inquiry in this case is: Have the courts of equity, by reason of the jurisdiction which they assume, to protect property where the damage can not be adequately com-

pensated at law, extended their protection to cases of the character of the one at bar?

I proceed first, to inquire with reference to its power to restrain criminal proceedings.

The general rule that a court of equity has no jurisdiction of a bill to stay criminal proceedings is so well settled, both in England and America, that it seems unnecessary for me to cite many authorities in support of the proposition, and I shall, therefore, merely refer to two leading cases, where the authorities in both England and America, are examined and considered, and the proposition above stated, declared to be settled beyond any doubt. The two cases to which I refer are, In Re Sawyer, 124 U. S. 200, 201, 211, and *Creighton* v. *Dahmer,* 70 Miss. 602.

The former case grew out of injunction proceedings in a United States Circuit Court, to restrain the mayor and councilmen of Lincoln, Nebraska, from removing from office the Police Judge, on the charge of retaining certain fines, and of colluding with gamblers and prostitutes. The circuit court granted a temporary restraining order, but, disregarding this, the council went on and removed the Police Judge. Thereupon, the members of the council were brought before the United States Circuit Court, and fined and imprisoned for contempt. They then filed application for a writ of *habeas corpus* in the Supreme Court of the United States, which was allowed, the court holding that the circuit court had no jurisdiction of a bill to stay criminal proceedings, or to restrain the removal of a public officer. Mr. Justice GRAY, who delivered the opinion, after collecting the English and American cases on the subject, said :

"The office and jurisdiction of a court of equity, unless enlarged by express statute, are limited to the protection of rights of property. It has no jurisdiction over the prosecution, the punishment, or the pardon of crimes or misdemeanors, or over the appointment and removal of public officers. To assume such a jurisdiction, or to sustain a bill in equity to restrain or relieve against proceedings for the punishment of offenses, or for the removal of public officers, is to invade the domain of courts of common law, of the executive or administrative department of government. * * *

"The modern decisions in England, by eminent equity judges, concur in holding that a court of chancery has no power to restrain criminal proceedings unless they are instituted by a party to a suit already pending before it, and to try the same right that is in issue there. *Attorney General* v. *Cleaver,* 18 Ves. 211, 220 ; *Turner* v. *Turner,* 15 Jurist 218 ; *Saull* v. *Browne,* L. R. 10 Ch. 64 ; *Kerr* v. *Preston,* 6 Ch. D. 463.

"Mr. Justice STORY. in his Commentaries on Equity Jurisprudence, affirms the same doctrine. Story, Eq. Jur., section 893. And in the American courts, so far as we are informed, it has been strictly and uniformly upheld, and has been applied alike, whether the prosecutions, or arrests, sought to be restrained, arose under statutes of the state, or under municipal ordinances. *West* v. *Mayor, etc., of New York,* 10 Paige 539 ; *Davis* v. *American Society for the Prevention of Cruelty to Animals,* 75 N. Y, 362 ; *Tyler* v. *Hamersly,* 44 Conn. 119, 422 ; *Stuart* v. *Board of Supervisors,* 83 Ill. 341 ; *Devron* v. *First Municipality,* 4 La. Ann. 11 ; *Levy* v. *Shreveport.* 27 La. Ann. 620 ; *Moses* v. *Mayor, etc., of Mobile,* 52 Ala. 198 ; *Gault* v. *Wallis,* 53 Ga. 675 ; *Phillips* v. *Mayor, etc., of Stone Mountain,* 61 Ga. 386 ; *Cohen* v. *Goldsboro, Commissioners,* 77 No. Car. 2 ; *Waters Pierce Oil Co.* v. *Little Rock,* 39 Ark. 412 ; *Spink* v. *Francis,* 19 Fed. Rep. 670, and 20 Fed. Rep. 567 ; *Suess* v. *Noble,* 31 Fed. Rep. 855."

In *Creighton* v. *Dahmer, supra,* the Supreme Court of Mississippi, after a review of the English and American Authorities, held that, " a court of equity can not grant an injunction against the prosecution of criminal

proceedings, even in case of a criminal prosecution for tresspass, in which a disputed property right is involved, as to which equity has jurisdiction to afford relief."

The court concludes this decision with the following statement:

"In *Montague* v. *Dudman*, 2 Ves., Sr., 396, Lord Chancellor HARD-WICKE declared that he was unable to discover a precedent for the exercise of the power, and said, 'I will go by Littleton's rule, that it is a good argument, an action lies not, because one was never brought, I never knew a bill of this kind, and, therefore, will not make the precedent.'"

There are a few cases in which the enforcement of void municipal ordinances, the execution of which directly affected property rights, have been enjoined, and criminal prosecutions before the authorities restrained. *City of Atlanta* v. *Gate City Gas Light Co.*, 71 Ga. 106; *Shinkle* v. *City of Covington*, 83 Ky. 420. But, with the exception of *Bottling Co.* v. *Welch*, 42 Fed. Rep. 561, and *Lottery Co.* v. *Fitzpatrick*, 3 Woods, 222, we have found no decisions of any court that a bill in equity may be exhibited for the single purpose of enjoining criminal prosecutions, and against these decisions stand the unbroken line of decisions of all courts of authority."

I come, now, to consider the claims of plaintiff that, notwithstanding this general rule so positively established, that equity will not interfere to stay criminal proceedings, yet it will interfere where property rights are involved.

An examination of all the authorities on this subject, both in England and America, will show, however, that the great weight of authority is opposed to this contention of plaintiff, and that the only exceptions which the courts have made to this general rule (except certain courts which we shall hereafter refer to), are in the following two classes of cases, within neither of which can the case at bar be brought. These exceptional classes are:

(1.) Cases in equity where a plaintiff attempts to resort to criminal proceedings to enforce against the defendant the same rights which he is pursuing against the defendant in the equity courts. "It is the double harrassing, first by the equity suit, and second by the criminal procedure, that the equity court interrupts." *Mayor of York* v. *Pelkington*, 2 Atk. 302; *Montague* v. *Dudman*, 2 Ves. Sr., 396; *Attorney-General* v. *Cleaver*, 18 Ves. Jr., 211; *Saull* v. *Browne*, L. R., 10 Ch. App., 64; Story's Eq. Jur., sec. 893; and *Spink* v. *Francis et al.*, 19 Fed. Rep. 670, and 20 Fed. Rep. 567.

(2) A class of cases in which the enforcement of *void* ordinances have been enjoined and criminal proceedings restrained. See cases collected on this subject in note to *Creighton* v. *Dahmer*, 21 L. R. A., 84.

That there is high and strong authority against this second line of cases is undoubted. But where the weight of authority is, I do not here inquire. Because the prosecutions here are not under a void ordinance, but under a statute admitted to be valid.

There is a class of cases in which courts of equity have interfered, upon the ground that property rights are interfered with, although the acts complained of would subject the defendant to criminal prosecutions. The cases known as "boycotting" cases illustrate this class. But such cases have no application to the present inquiry, because they do not restrain criminal prosecutions.

That the overwhelming weight of authority is against the right of equity to enjoin criminal proceedings under a valid statute even though property interests are involved, will appear from the examination of the following cases.

Among the leading English cases is that of *Kerr* v. *Preston*, 6 Ch. Div. 463, (decided 1877), in which it was held that a court of equity had no jurisdiction to restrain criminal proceedings for the recovery of a penalty

imposed by act of Parliament for building a house out into a street. Jessel, M. R., says, page 466–467:

"The object of the action is to restrain a local board from taking proceedings before the magistrate, against the plaintiff, by reason of his having advanced his building beyond the line of frontage. The main equity suggested on behalf of plaintiff is that the local board knew of their intention before the erection of the building, yet stood by and allowed them to incur expense.

"The first question is, whether there is equity to restrain a proceeding of the kink now threatened. It is a criminal proceeding instituted by information in the usual way. Why ought a court of equity to interfere with the ordinary proceedings of a criminal court? I am not aware of any such power."

In *Suess* v. *Noble, Justice of the Peace, and others*, 31 Fed. Rep. 855, (1877), the suit was brought by the owner of a brewery, to restrain certain justices of the peace and other officers, in Iowa, from arresting and prosecuting him for selling intoxicating liquors. The petition stated that he had been indicted for nuisance for selling beer at his brewry, convicted, and had appealed to the federal court upon the point of the constitutionality of the prohibitory law. He asked an injunction against further prosecutions, pending the final determination of that case.

In refusing the injunction the court, LOVE, J., said:

"The proceeding now before me is in the nature of an application to restrain the defendants, by injunction, from the prosecution of sundry proceedings against the plaintiff under the prohibitory law. It is alleged, and no doubt truly, that if the defendant be permitted to vex and pursue the plaintiff with numberless criminal prosecutions before justices of the peace and other state tribunals, the plaintiff will be compelled to abandon his business, and that his brewery property will be rendered useless and valueless. We are thus brought face to face with the question whether, or not, a court of equity has any power to interfere, by injunction, or otherwise, with the criminal laws of the state. I have repeatedly announced, orally, from the bench, in this class of cases, that no such power exists. * *

"Upon what ground, then, do courts of equity assume jurisdiction in any case whatever? It is upon the ground that no adequate remedy at law exists, and that injustice would be done if a court of equity did not interfere to give a better remedy than courts of law are, by their very constitution, competent to administer. It would, therefore, be preposterous for courts of equity to assume jurisdiction, and especially to interfere with actual proceedings at law in cases where a court of equity is utterly incompetent to give any remedy, whatever. For a court of equity to interfere by staying proceedings at law where there is some remedy, however imperfect, and then stand paralyzed and utterly impotent to remedy the assumed evil and injustice, would be the very height of legal absurdity.

"Now, every lawyer knows that a court of equity is utterly incompetent, by its very nature and constitution, to give any remedy, whatever in criminal cases, In such cases it is simply powerless. It can hear and determine nothing. It can neither acquit nor condemn the off·nder. It can pronounce no decree concerning the offense. It can not pardon or release the offender. Public offense must be tried by jury, and the trial by jury is unknown to the system of equity. For equity to interfere by arresting the processes of the common law, while impotent to give any remedy of its own, would be like the folly of tearing down one's house, because it should afford but imperfect shelter, without ability to replace it with any other structure whatever.

"Again, public offenses are prosecuted, in England, in the name of the King, and in the United States in the name of the State. It is manifest

that neither the king nor the State could be made a defendant to a bill in equity. The restraining power of the court would be futile as against them ; and it would avail nothing for the court to address its restraining process to public and private prosecutors, even if the power to do so existed, since the State would readily find other agents to represent it in the criminal proceeding. Courts of equity, therefore, deal only with civil and property rights. They have no jurisdiction to give relief in criminal cases, and they will not, therefore, interfere by injunction with the course of criminal justice." *Kerr* v. *Corporation of Preston,* 6 Ch. Div. 463 ; *Saull* v. *Browne,* 10 Ch. App. 64 ; *Moses* v. *Mayor,* 52 Ala. 198 ; *Joseph* v. *Burk,* 42 Ind 59 ; *Gault* v. *Wallis,* 53 Ga. 675."

In the case of *Hemsley et al.* v. *Meyers,* 45 Fed. Rep. 283, the "complainants' bill for injunction, filed in the Circuit Court of the United States, alleged that they were the agents of liquor dealers living in another state and, as such, were engaged in selling in Kansas liquors in the original packages in which they were imported by their principals ; that by civil and criminal proceedings under the prohibitory law of Kansas defendants were seeking to break up and destroy complainants' business, in violation of their rights under the federal constitution ; and it prayed that they be restrained from further proceedings in the premises. There was no allegation that defendants were insolvent."

The court denied the injunction, placing its denial, among other grounds, upon the ground that equity had no power to restrain criminal proceedings. The following citation from the decision of Judge CALDWELL has great pertinency to the case at bar. He said :

"The cases at bar present, in a forcible light, the inability of a court of equity to deal with criminal prosecutions by injunction or otherwise, and the utter confusion and failure of justice that would inevitably result from the exercise of such jurisdiction. The answers and affidavits filed in some of these cases deny that the plaintiff's sales were limited to original packages, and aver that they sold otherwise than in original packages and on the Lord's day, and to minors, and that the business was conducted in such a manner as to make it a nuisance. If the court should assume jurisdiction of the cases, the chancellor, sitting without a jury, would have to hear and determine all these issues. And for what and with what result ? If the chancellor should find the plaintiffs had violated the state law, as alleged by the defendants, he would be powerless to punish them for the offense. If he found the averments in the bill to be true, and granted a perpetual injunction in the terms of the temporary injunction in this case, the court could punish the defendants for a violation of the injunction, but it would have no power to punish the plaintiffs for afterwards selling in violation of the state law. Saloons are the source of a large percentage of the lawlessness and crime in the land, and their proprietors and managers are not particularly distinguished for their strict observance of the laws regulating or restraining the business. Suppose an original package vendor after securing a perpetual injunction, as prayed in this case, sells liquor not in original packages, or otherwise violates the state law, what are the officers of the court, whose duty it is to prosecute in such cases, to do ? Must they apply to this court for leave to prosecute before commencing proceedings in the state court ? Undoubtedly, if they should proceed without the previous leave of the court, the plaintiffs would charge them with a violation of the injunction, and ask the court to punish them for contempt ; and the chancellor would again be required to try the same issues of fact, with a view to determine whether the state officers including the judges of the state courts, should be punished for contempt, or whether such officers should graciously have leave to prosecute the plaintiffs for a violation of the criminal laws of the state. It is obvious, that if this

court once assumed this jurisdiction, it wold speedily draw to itself the supervision and control of all the criminal prosecutions in the state grow-out of the traffic in liquor; for it is quite certain, if the court once enters upon this business, that every vendor of liquor in the state will claim to be a dealer in original packages only, and whenever a prosecution is commenced against him he will at once seek the shelter and protection of an injunction from this court. And the extraordinary spectacle would be presented of a United States court of chancery having its whole time taken up in keeping watch and ward over all the saloons in the state, protecting the proprietors and their clerks from prosecution, until it should be first shown by the state, to the satisfaction of the chancellor, that the state law had been violated, when the chancellor would make an order granting the state leave to prosecute for that violation."

In *Davis* v. *Society for the Prevention of Cruelty to Animals*, 85 N. Y. 362 (1878), the Court of Appeals of New York held that injunction would not lie to restrain arrests by Bergh for cruelty in slaughtering hogs, although the plaintiffs averred that the hogs were killed by the most humane and painless methods, and the threatened arrests, if made, would irreparably damage them in their business. In deciding the case, EARL, J., said:

"Hence it cannot be disputed that Bergh was acting under a valid law and regular authority, and that he had the right to make the treatened arrests, if the plaintiffs were actually engaged in violating the law to prevent cruelty to animals. The only question for contestation was whether, as matter of fact, they were guilty, or innocent, of such violation; and the determination of that question could not, by such action as this, be drawn to a court of equity. Whether a person accused of a crime be guilty, or innocent, is to be determined in a common law court by a jury; and the people, as well as the accused, have the right to have it thus determined. If this action could be maintained in this case, then it could in every case of a person accused of a crime, where the same serious consequences would follow an arrest; and the trial of offenders, in the constitutional mode prescribed by law, could forever be prohibited. A person threatened with arrest for keeping a bawdy-house, or for violating the excise laws, or even for the crime of murder, upon, the allegation of his innocence of the crime charged and of the irreparable mischief which would follow his arrest, could always draw the question of his guilt or innocence from trial in the proper forum. An innocent person, upon an accusation of crime, may be arrested and ruined in his character and property, and the damage he thus sustains is *damnum absque injuria*, unless the case is such that he can maintain an action for malicious prosecution or false imprisonment. He is exposed to the risks of such damage by being a member of an organized society, and his compensation for such risks may be found in the general welfare which society is organized to promote."

In *Kramer* v. *Board of Police of the Police Department of the City of New York*, 63 New York Superior Court Reports, 492, (1886), an action was brought by plaintiff to restrain the police department from arresting his employes for selling liquor in the auditorium of his theater, claiming that he would suffer irreparable damage to his property unless defendants were so restrained. The syllabus of the decision is as follows:

"An action in equity will not lie to determine the question of the guilt or innocence of one charged with an offense against the criminal law. Therefore, where, from the complaint in an action for an injunction, it appears that the acts sought to be restrained consisted in the arrest, by the police department, of persons claimed by it to be engaged in the selling of wine, etc., in the auditorium or lobbies of places where theatrical, minstrel, circus, acrobatic, juggling, or rope dancing performances are given, contrary to the consolidation act, which makes such selling a misdemeanor

and its interference with a business claimed by it to consist in part of such sale, and that the injunction is asked for on the sole ground that the plaintiff violates no law, but that nevertheless the police, under such claim, threaten to arrest the plaintiff and his employes, and to interfere with his business, whereby he will sustain irreparable injury which can not be estimated or ascertained in an action at law, a court of equity has no jurisdiction to grant the injunction."

Many authorities to the same effect might be cited, but the above citations seem to me sufficient to make clear the doctrine of courts of equity upon this subject, and the reasons for the same.

The plaintiffs, however, cite the following cases in which criminal prosecutions have been restrained: *Schaudler* v. *Welch*, 42 Fed. Rep. 561; *Lottery Co.* v. *Fitzpatrick*, 3 Woods, 222; *Louisiana* v. *Lagarde*, 60 Fed. Rep. 186; *South Covington* v. *Berry*, 93 Ky. 43; *Shinkle* v. *Covington*, 83 Ky. 420; *Mobile* v. *L. & N. Ry.*, 84 Ala. 115; *Atlanta* v. *Gas Co.*, 71 Geo. 106; *Rushville* v. *Gas Co.*, 132 Ind. 575.

In regard to the federal cases cited above, I shall not inquire whether they are in conflict with the decisions of other federal courts, nor, if there is such a conflict, which class of cases should be followed; because, in my opinion, they do not necessarily conflict with the principle which we have seen controls courts of equity in regard to restraining criminal prosecutions. They simply decide a question of federal law, and hold that where a statute of a state violates a provision of the constitution of the United States, and affects property rights, the federal courts may restrain the officials of a state from enforcing such provision, and need not await the decision of the state courts upon such question of federal law, because it is the especial province of the United States courts to protect rights guaranteed by the constitution of the United States.

The Indiana, Alabama, Kentucky and Georgia cases belong to the class previously referred to, where the courts have interfered to restrain criminal prosecutions under a void ordinance, which threatened irreparable damage to the property of the plaintiff.

In regard to these cases, I can only say what I have previously said when they were first referred to, viz: That there is a conflict of authority upon this question, but that it was unnecessary for me to determine where the weight of authority was, because this action is not to restrain proceedings under a void ordinance, but under a valid statute, the contention of plaintiff being that he is not guilty of the charge.

But if an examination of these cases would disclose a principle there declared which would make them undistinguisable in principle from the case at bar, then I must be permitted, with the Supreme Court of Mississippi, in *Crighton* v. *Dahmer*, to say that I must decline to follow them.

(2.) I come, next to inquire as to the right of plaintiff to enjoin because the defendant is threatening to prosecute more cases than the defendant can defend.

The principle which we have found applicable in the previous discussion as to the right to enjoin any criminal prosecution, makes no distinction because of the fact that one or more prosecutions are in progress before the courts of law, or because one or more prosecutions are threatened to be begun in such courts.

But even if the existence or the threats of a large number of prosecutions would make an exception in the application of the principle referred to, nevertheless, it seems to me that the following facts, as they appear from the petition, would preclude this case from falling within the exception.

(a) The statement that the defendants are about to begin a greater number of prosecutions than plaintiff can defend is a mere conclusion. It is not supported by the facts alleged.

(b)  The intention of the statute is to permit as many prosecutions as there are offenses.

(c)  If, in law, the prosecution of druggists and their clerks is a prosecution of the plaintiff, then it is to be presumed that the magistrate before whom such prosecutions are had, will, in the exercise of a wise discretion, grant continuances as they become necessary; and if they should not, an abuse of their discretion would be reviewable on error.

(3.)  The third relief prayed for is against the publishing by the defendants of false statements as to the ingredients of Paskola, because such publications irreparably damage plaintiff's business.

Whatever may be the law of England, to-day, by reason of certain acts of Parliament with reference to the rights of parties engaged in trade to enjoin the publication of a libel affecting such trade, the law in this country is well settled that equity will not enjoin the publication of such libel, but will refer the plaintiff to courts of law for his remedy.  *Kidd* v. *Horry*, 28 Fed. Rep. 773;  *Wheel Co.* v. *Bemis*, 29 Fed. Rep. 95;  *Boston Diatite Co.* v. *Florence Manufacturing Co.*, 114 Mass. 69;  and  *Whitehead* v. *Kitson*, 119 Mass. 484.

And in the case of *Francis et al.* v. *Flinn*, 118 U. S. 385, the Supreme Court of the United States refused to enjoin such a libel, even though it was the result, as claimed, of a conspiracy upon the part of a number of defendants.

And in *Williams et al.* v. *McNeal, Dairy and Food Commissioner*, 6 Cir. Court, 280, it was held that, under the statute, "The Dairy and Food Commissioner is authorized to print, publish and circulate such matter as may be necessary to inform dealers and the public of violations of the laws against fraud and adulteration or impurities in food, drinks or drugs."

(4.)  The last prayer of plaintiffs is for an order restraining defendants from threatening all persons who sell Paskola that they will be prosecuted, inasmuch as such threats drive away the customers of plaintiff and irreparably injure its business.

The right to such relief is based upon two classes of cases, viz.:  (1). Those relating to patents, in which the courts have enjoined parties issuing circulars or making other publications to the effect that all persons purchasing the article sold by complainant would be prosecuted, and, by this means, terrorizing and driving away the complainant's customers. And (2), those cases growing out of boycotts, in which the defendants, by threats familiar to that class of cases, and contained in circulars, or other publications, terrorize or threaten, either with physical injury or withdrawal of custom, all persons dealing with or who enter into the employ of the boycotted person or firm.

The cases cited by plaintiff in support of its contention for relief under this head are:

*Emack* v. *Kane*, 34 Fed. Rep. 46;  *Casey* v. *Typographical Union*, 45 Fed. Rep. 135;  *Coeur D'Alene Consolidated & Mining Co.* v. *Miner's Union*, 51 Fed. Rep. 260.

These are the leading cases upon the subject, and illustrate and enforce the principle which plaintiff claims applicable to this case.

In *Emack* v. *Kane*, the complainant and defendants were manufacturers of slates for the use of school children, and a controversy had arisen between them as to who was entitled to manufacture such slates in a certain manner covered by patents.  The court restrained the defendants from issuing circulars threatening to bring suits for infringements against persons dealing in complainant's article.

But in that case the court not only found that these circulars were issued maliciously with intent to injury complainant's business, but that defendants did not intend to bring any suits for infringements against any-

one to obtain redress for infringements and to vindicate the validity of their patents by a suit.

But in this case it is not contended that the·defendants do not intend to carry out their threats of arresting all persons selling Paskola. On the contrary, one of the complaints in the petition is that they intend to make so many arrests that the plaintiff will not have an opportunity of defending all of the actions. The case, therefore, differs, it seems to me, in a very important particular, from that of *Emack* v. *Kane.*

The principle upon which restraining orders are issued in the boycotting cases is clearly and fully stated in *Coeur D'Alene Consolidated & Mining Co.* v. *Miners' Union*, supra, in which the court, after reviewing the authorities which hold that a mere libel against a business will not be restrained, but that libels as a part of a boycott intended to intimidate customers or workmen will be enjoined, says:

"A clear distinction will be observed between the two classes of cases above noted. In the one, when the acts complained of consist of such misrepresentations of a business that they tend to its injury and damage to its proprietor, the offense is simply a libel; and in this country the courts have with great unanimity, held that they will not interfere by injunction, but that the injured party must rely upon his remedy at law. On the contrary, when the attempt to injury consists of acts or words which will operate to intimidate and prevent the customers of a party from dealing with or laborers from working for him, the courts have with nearly equal unanimity, interposed by injunction. In the one case it is an injury to a man's business by libeling it; in the other, by force, threats and other like means, he is prevented from pursuing it; and while the damage might be as great in one case as in the other—but most likely with different consequences to the good order and peace of the community —the courts have determined upon different remedies. What constitute such actionable threats or intimidations must be determined in each case from all the circumstances attending it. If the things done or the words spoken are such that they will excite fear or reasonable apprehension of damages, and so influence those for whom designed as to prevent them from freely doing what they desire, and the law permits, they may be restrained and the courts will look beyond the mere letter of the act or word into its spirit and intent."

If we concede, for the sake of the argument, that there is no difference in principle between an unlawful conspiracy to drive away customers by a boycott, which threatens injury to such customers, and the threats of an official to arrest every customer of a firm who sells its goods, we are, nevertheless, met with a practical difficulty in applying the principle in this case, which makes it impossible of application, or if not impossible of application, yet attended with such embarrassments, both to the courts and the officials of the state when they desire, in good faith, to prosecute, that equity will not assume the jurisdiction.

That courts of equity give a controlling weight to such considerations, is well settled. As an illustration of this principle, I cite section 23, of Spelling on Extraordinary Relief, where it is said:

"An injunction will not be granted where it would cause great injury to the defendant and might be a serious detriment to the public without corresponding benefit to the plaintiff. The question of relative convenience, or inconvenience, which may result to the parties by granting or withholding the writ, is also often important. If, upon due consideration of such question, it is apparent that the act complained of is likely to result in irreparable injury to complainant, and the balance of inconvenience preponderates in his favor, the injunction will be granted. On the other hand, if it appears that greater danger or inconvenience will result

to defendant rather than to plaintiff from granting it, or when the inconvenience seems equally divided between the parties, the injunction will be refused, and the parties left as they are, until a determination of legal rights can be had at law."

In the case of a boycott, the order of injunction restrains the defendants from doing a wrongful act, viz: Threatening or intimidating customers. The act is wrongful at the time the order is issued, and is wrongful ever afterwards whenever it may be committed. Any subsequent commission of the act is a violation of the order, and is punishable for contempt. In other words, the court has before it a definite act, always wrongful, and therefore, enjoins it. Upon proceedings to punish for contempt, the only injury is, was the enjoined act committed?

If, however, a court should entertain jurisdiction in a case of this character, the order of injunction would restrain the defendants from either (1) prosecuting, or threatening to prosecute, persons selling Paskola, which is not adulterated, or, (2) from prosecuting, or threatening to prosecute, persons selling Paskola.

I am unable to conceive upon what ground a court would be justified in making any other order than one or the other of those just indicated.

Let us assume, now, that a court has issued injunctions in either the one form or the other. In case of an alleged violation of the court's order, and a proceeding against the defendants for contempt, two inquiries would have to be gone into on every occasion, viz.:

(1.) Is the prosecution or the threat malicious? Because, if not, the plaintiff could not be enjoined from either prosecuting or threatening to prosecute, for the reason that the law forbids interference with the discretion of a public officer who is acting in good faith, unless the act complained of is a ministerial act. *Enterprise Saving Association* v. *Zumstein, Postmaster*, 64 Fed. Rep. 837. But the determination by an officer, after investigation, as to whether he will institute criminal prosecutions, or not, against certain persons, for the sale of a drug or product which he believes to be adulterated, is certainly an act of discretion, and not a ministerial act. And the mere fact that the defendants had maliciously conspired at one time to prosecute, or threaten, would not so fasten malice upon them that they could never in the future be permitted in good faith to prosecute or threaten to prosecute, but must be conclusively held to be acting maliciously.

(2.) Is the product adulterated which is sold by the persons against whom the prosecution has been begun or the threats made? Because, if adulterated, then the acts of the defendant are lawful, however malicious. And Paskola, being a manufactured product, may vary from time to time as to its purity, quality and strength.

It is thus seen that the courts would never conclude the hearing of such a case, but would be continually trying and re-trying it. It would be an endless chain of trials. And no dealer or vendor of the product could be convicted by the criminal courts until the officers of the state had first come into a court of equity and satisfied the chancellor that they had an absolutely good case, when the chancellor, instead of punishing the offender, would then send the case to the criminal courts for a trial before a jury.

It seems to me, therefore, that, in view of the fact that, under the circumstances of such a case as this is, it would be impossible to issue a restraining order which could be enforced without involving the court in embarrassments from which it could never relieve itself, no such order should be granted; and that, in refusing to grant it, a court would be sustained by reason, principle and authority.

The remedy of the plaintiff in this case, under the facts alleged, there-

fore, must be found either in a defense in the criminal courts, a proceeding of impeachment against the officer, as provided in the constitution of the state, article 2, section 24, an indictment against him and prosecution in the criminal courts, or a civil action for damages. If these remedies are not ample to fully protect the plaintiff, then the damage suffered by him is *damnum absque injuria*, and, in the language of the Court of Appeals of New York, " He is exposed to the risks of such damage by being a member of an organized society, and his compensation for such risks of damage by being a member of an organized society, and his compensation for such risks may be found in the general welfare which society is organized to promote."

The demurrer to the petition will be sustained.

*Miller Outcalt* and *Walter L. Granger*, for plaintiffs.

*J. K. Richards*, Attorney General, *W. T. Clark*, of Cleveland, and *Amos Dye*, for defendants.